**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SBARRO, INC., *et al.*,[1] | ) | Case No. 11-11527 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

## DISCLOSURE STATEMENT FOR PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SBARRO, INC. AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C.
Edward O. Sassower
Nicole L. Greenblatt
Paul Wierbicki (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel to the Debtors and Debtors in Possession

Dated: August 9, 2011

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL AFTER A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sbarro, Inc. (1939); Sbarro Holdings, LLC (3819); Carmela's of Kirkman Operating, LLC (1182); Carmela's of Kirkman LLC (7703); Carmela's, LLC (8088); Corest Management, Inc. (9134); Demefac Leasing Corp. (2379); Larkfield Equipment Corp. (7947); Las Vegas Convention Center LLC (7645); Sbarro America Properties, Inc. (9540); Sbarro America, Inc. (9130); Sbarro Blue Bell Express LLC (1419); Sbarro Commack, Inc. (4007); Sbarro Express LLC (0253); Sbarro New Hyde Park, Inc. (6185); Sbarro of Las Vegas, Inc. (2853); Sbarro of Longwood, LLC (0328); Sbarro of Virginia, Inc. (2309); Sbarro Pennsylvania, Inc. (3530); Sbarro Properties, Inc. (9541); Sbarro Venture, Inc. (3182); Sbarro's of Texas, Inc. (5139); Umberto at the Source, LLC (8024); Umberto Deer Park, LLC (8728); Umberto Hauppauge, LLC (8245); Umberto Hicksville, LLC (0989); Umberto Huntington, LLC (8890); and Umberto White Plains, LLC (8159). The Debtors' service address is: 401 Broadhollow Road, Melville, New York 11747.

## IMPORTANT INFORMATION FOR YOU TO READ

**THE DEADLINE TO VOTE ON THE PLAN IS                  , 2011, AT 5:00 P.M. EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the *Proposed Joint Chapter 11 Plan of Reorganization of Sbarro, Inc. and Its Debtor Affiliates* (the "*Plan*") to Holders of Claims and Equity Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The Debtors urge any Holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan. The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of its property other than as set forth in this Disclosure Statement.

The Debtors urge every holder of a Claim or Equity Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Section VII of this Disclosure Statement and (3) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto or filed in connection herewith and the proposed transactions contemplated under the Plan <u>before</u> deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been audited. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver. Rather, Holders of Claims or Interests and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to the numerous contested matters, adversary proceedings and other pending or threatened litigation or actions. No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or Reorganized Debtors may seek to investigate, file and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "*SEC*") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act or any securities regulatory authority of any state under any state securities law ("*Blue Sky Law*"). The Debtors are relying on the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis set forth in <u>Exhibit D</u>, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

<u>Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative.</u> The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' Notice and Claims Agent (i) at its website at http://dm.epiq11.com/sbarro; (ii) by writing to Sbarro, Inc. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, New York 10150-5014; or (iii) by calling 1-877-835-1721 or Non-U.S./Non-Canada: 1-503-597-7707.

**TABLE OF CONTENTS**

**Page**

I. EXECUTIVE SUMMARY ............................................................................................................. 1
    A.    The Plan ................................................................................................................ 1
    B.    The Overbid Process ............................................................................................ 4
    C.    Summary of Classification and Treatment of Allowed Claims and Equity Interests Under the Plan ............................................................................................. 4
    D.    Voting on the Plan ................................................................................................ 5
    E.    Additional Plan-Related Documents ..................................................................... 7
    F.    Confirmation and Consummation of the Plan ....................................................... 8

II. BACKGROUND TO THESE CHAPTER 11 CASES ........................................................ 10
    A.    The Debtors' Business ........................................................................................ 10
    B.    Prepetition Capitalization and Indebtedness ....................................................... 13
    C.    Restructuring Initiatives and Events Leading to Chapter 11 ............................... 14

III. SBARRO'S CHAPTER 11 CASES AND DEVELOPMENTS THEREIN ...................... 17
    A.    First Day Motions and Certain Related Relief .................................................... 17
    B.    Certain Operational Initiatives During the Chapter 11 Cases ............................. 20
    C.    Summary of Claims Process and Bar Date .......................................................... 20
    D.    Developments Related to the Plan of Reorganization .......................................... 21
    E.    Exclusivity .......................................................................................................... 22
    F.    The Prepetition Second Lien Lender Adversary Proceeding ............................... 23

IV. SUMMARY OF THE JOINT PLAN ................................................................................. 23
    A.    Administrative Claims, DIP Facility Claims, Priority Tax Claims, and United States Trustee Statutory Fees ............................................................................. 23
    B.    Classification and Treatment of Claims and Interests ......................................... 26
    C.    Means for Implementation of the Plan ................................................................ 31
    D.    Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies ...................................................................................... 37
    E.    Provisions Governing Distributions .................................................................... 40
    F.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Equity Interests .................................................................................................. 45
    G.    Conditions Precedent to the Effective Date ........................................................ 47
    H.    Release, Injunction and Related Provisions ........................................................ 48
    I.    Retention of Jurisdiction ..................................................................................... 51
    J.    Modification, Revocation, or Withdrawal of Plan .............................................. 52
    K.    Miscellaneous Provisions .................................................................................... 53

V. VALUATION ANALYSIS AND FINANCIAL PROJECTIONS ..................................... 57
    A.    Valuation of the Reorganized Debtors ............................................................... 57
    B.    Financial Projections ........................................................................................... 57

VI. CONFIRMATION PROCEDURES .................................................................................. 58
    A.    Statutory Requirements for Confirmation of the Plan ........................................ 58
    B.    Alternatives to Confirmation and Consummation of the Plan ............................. 61
    C.    Contact for More Information .............................................................................. 62

VII. PLAN-RELATED RISK FACTORS ............................................................................... 62
    A.    General ................................................................................................................ 62
    B.    Certain Bankruptcy Law Considerations ............................................................ 62
    C.    Risk Factors that May Affect Recoveries Under the Plan ................................... 64
    D.    Risk Factors that Could Negatively Impact the Debtors' Business ...................... 66

E.     Risks Associated with Forward Looking Statements ............................................... 69
F.     Disclosure Statement Disclaimer ............................................................................. 70

**VIII. IMPORTANT SECURITIES LAW DISCLOSURE** ................................................................ **72**

**IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...................... **73**
A.     Certain United States Federal Income Tax Consequences to Holders of Allowed Claims ............ 74
B.     Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors ............................. 78

**X. GLOSSARY OF DEFINED TERMS** ....................................................................................... **80**
A.     Rules of Interpretation ............................................................................................. 80
B.     Defined Terms ......................................................................................................... 80

**XI. CONCLUSION AND RECOMMENDATION** ...................................................................... **91**

## EXHIBITS

**Exhibit A**        Joint Plan of Reorganization

**Exhibit B**        Solicitation Procedures Order

**Exhibit C**        Financial Projections

**Exhibit D**        Liquidation Analysis

**Exhibit E**        Prepetition Corporate and Capital Structure Chart

K&E 19518290

# I.    EXECUTIVE SUMMARY

Sbarro, Inc. and its affiliated debtors and debtors in possession (collectively, "**Sbarro**" or the "**Debtors**" and, as reorganized pursuant to the Plan, the "**Reorganized Debtors**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on April 4, 2011 (the "**Petition Date**").  Sbarro's chapter 11 cases are jointly administered for procedural purposes only under lead case number 11-11527 (SCC).

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors because the Debtors are asking Holders of Claims and Equity Interests to accept the *Proposed Joint Chapter 11 Plan of Reorganization of Sbarro, Inc. and Its Debtor Affiliates*, dated August  9, 2011.  A copy of the Plan is attached hereto as **Exhibit A**.  Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to those terms in the Plan.

On _____, 2011, the Bankruptcy Court entered an order [Docket No.  ___] (the "**Solicitation Procedures Order**") (a) approving the Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan and (d) scheduling the Confirmation Hearing.  The Solicitation Procedures Order is attached hereto as **Exhibit B**.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable Shelley C. Chapman at __:__  _.m. Eastern Time on _____, 2011 at the Bankruptcy Court, located at One Bowling Green, New York, New York 10004-1408, Courtroom 610.  Additional information with respect to Confirmation is provided in Article VI of this Disclosure Statement, entitled "*Confirmation Procedures*."

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan. Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of negotiations among Sbarro and other parties, have not been finally agreed upon and may be modified.

*This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  The Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan and the Plan Supplement, which will be filed no later than 10 days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court.  Sbarro urges all parties to read this Executive Summary in conjunction with the entire Disclosure Statement, the Plan and the Plan Supplement.*

## A.    THE PLAN

### 1.    Purpose and Effect of the Plan

Sbarro is reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and

persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Equity Interests. Under the Plan, Claims and Equity Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates. Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the 28 Debtors in these Chapter 11 Cases. Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, Sbarro's ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan and pay certain continuing obligations in the ordinary course of Reorganized Sbarro's business. Sbarro's financial projections are set forth on **Exhibit C**. Although Sbarro believes the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty. Actual results will differ from the projections, and the differences may be material. Sbarro's business plan and projections incorporate Sbarro's forecasts of the anticipated operating performance of its foreign subsidiaries and joint ventures that are not subject to these Chapter 11 Cases.

## 2. Financial Restructurings under the Plan

As of the Petition Date, the Debtors had outstanding funded debt in the aggregate principal amount of approximately $368.2 million, consisting of: (a) approximately $176.2 million outstanding under the Prepetition First Lien Credit Facility (including accrued and unpaid interest and approximately $3.5 million in issued and outstanding letters of credit); (b) approximately $34.2 million in principal plus accrued paid-in-kind interest outstanding under the Prepetition Second Lien Credit Agreement; and (c) approximately $157.8 million (including unpaid prepetition interest) in unsecured Senior Notes.

As a result of the proposed Plan, the Reorganized Debtors will emerge with approximately __% less funded debt after giving effect to the following restructuring transactions:

- $35 million of loans expected to be outstanding under the DIP Facility will be converted on a dollar-for-dollar basis into a portion of the $110 million Exit Term Loan Facility and issued to the DIP Lenders on the Effective Date;

- Approximately $75 million of the Prepetition First Lien Credit Facility will be converted into the remainder of the $110 million Exit Term Loan Facility to be issued Pro Rata to the Prepetition First Lien Lenders on the Effective Date;

- The remaining approximately $100 million in secured indebtedness outstanding under the Prepetition First Lien Credit Facility (excluding amounts related to existing letters of credit, which will be addressed with the New Money Exit Facility) plus any First Lien Adequate Protection Claims that are not otherwise restructured under the Exit Term Loan Facility will be converted into 100% of the common equity of Reorganized Sbarro and distributed Pro Rata to the Prepetition First Lien Lenders on account of the obligations owed to them under the Prepetition First Lien Credit Facility and the First Lien Adequate Protection Claims;

- The Debtors' obligations under the Prepetition Second Lien Credit Agreement will be canceled and discharged;

- General Unsecured Claims against the Debtors, including $150 million in outstanding unsecured Senior Notes plus accrued interest, will be canceled and discharged;

- The general unsecured Claims held by certain trade creditors with whom the Debtors intend to conduct business post-emergence will receive their Pro Rata share of $250,000 in Cash;

- All Equity Interests in Sbarro Holdings, LLC will be extinguished; and

- Certain of the Debtors' Prepetition First Lien Lenders have committed to provide the Debtors with a new money term loan facility of $18.6 million to be used for general corporate and working capital needs (as well as to cash collateralize letters of credit), $__ million of which is expected to be funded on the Effective Date.

Consummation of the Plan and the financial restructurings contemplated thereby will significantly de-lever the Debtors' capital structure, leaving the Debtors with approximately $__ million in funded debt on the Effective Date. With a sustainable capital structure aligned with the Debtors' revised business plan, the Reorganized Debtors will be better positioned to compete more effectively in the quick-service restaurant industry. Indeed, as a result of the Plan, the Debtors will reduce their annual interest carrying costs by $__ million.

Under the Plan, the Debtors' Prepetition First Lien Lenders will own substantially all of the New Common Stock in Reorganized Holdings, subject to dilution only by shares allocated to Reserved Employee Equity and/or issued in connection with the Management Equity Plan.

### 3. Recovery Analysis

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business and protects the jobs of employees. After a careful review of their current operations, prospects as an ongoing business, financial projections and estimated recoveries to creditors in a liquidation scenario, the Debtors have concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part, and that the value of the Debtors' estates is considerably greater as a going concern.

Substantially all of the Debtors' assets and value are subject to valid and perfected liens held by the DIP Lenders and the Prepetition First Lien Lenders, which require payment in full before any distributions can be made to junior creditors. Thus no distributions would be made to any Holders of junior Claims absent consummation of the Plan as proposed, unless the overbid process (described below) results in enhanced creditor recoveries.

In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in extensive discussions and negotiations with all their key stakeholders, including their Prepetition First Lien Lenders, who will be the primary economic stakeholders in the Reorganized Debtors under the Plan. The Debtors, with the assistance of their advisors, have also undertaken significant efforts both pre- and postpetition to market the business to incumbent and third party potential plan sponsors or acquirers, which efforts are ongoing as of the date hereof and which the Debtors hope will result in improved creditor recoveries. Ultimately, however, taking into account the need for a successful and expedient restructuring process, the Debtors have determined to proceed with the proposed Plan, which is backed by funding commitments of certain of the Debtors' Prepetition First Lien Lenders and achieves the Debtors' two primary restructuring objectives: right-sizing their balance sheet and securing liquidity to fund ongoing working capital and operational needs.

The Debtors believe that the Plan, subject to the Overbid Process described below, provides the best recoveries possible for the Debtors' stakeholders and recommend that, if you are entitled to vote, you vote to accept

the Plan. The Debtors' believe that any alternative to confirmation of the Plan, such as liquidation or a partial sale of assets would result in lower recoveries for stakeholders, significant delays, litigation and other costs.

## B.     THE OVERBID PROCESS

To ensure maximum recoveries for their creditor constituencies, the Debtors have filed a motion [Docket No. ___] (the "*Bidding Procedures Motion*") to approve bidding procedures and establish an auction process for interested parties to "top" the stalking horse proposal embodied in the current Plan (the "*Overbid Process*"). If approved, these bidding procedures will allow any interested bidder to submit a proposal on higher and better terms than those reflected in the Plan. This further market-testing of the Plan will ensure maximum recoveries to the Debtors' creditors.

The proposed bidding procedures specify that, in order to qualify as a potential bidder (a "*Qualified Bidder*"), any interested party must agree, at a minimum, to provide the following consideration (the "*First Lien and DIP Lender Consideration*") to satisfy the Prepetition First Lien Lender Claims and the DIP Facility Claims:

- Cash in an amount no less than $[211.3][2] million; or

- such other consideration as agreed in writing by the Prepetition First Lien Steering Committee and DIP Lenders; or

- solely in the case of a Qualified Bidder that is also approved by the Prepetition First Lien Steering Committee (an "*Acceptable Bidder*"), the Staple Term Loan Facility ($110 million in exit financing on common terms that will be made available to Qualified Bidders) plus Cash from such Acceptable Bidder to satisfy in cash, in full the DIP Facility Claims and remainder of the Prepetition First Lien Lender Claims.

The Debtors believe the "stapled" financing option contemplated by the Overbid Process is particularly valuable for encouraging meaningful participation in an auction process. The Staple Term Loan Facility encourages superior bids by facilitating $110 million of senior secured debt on common terms. As a result, Acceptable Bidders can formulate proposals with reduced financing risk and transaction costs, which should promote a more robust auction.

At the conclusion of the bidding period/auction, should the Debtors select a "topping" bid that differs from the proposed Plan, the Debtors will file a modified Plan in accordance with the terms of the successful bid and any applicable sections of the Bankruptcy Code. The Debtors cannot state with certainty the number of alternative bidders, if any, that will seek to participate in the auction. The Bidding Procedures Motion, however, contemplates **every Holder of a Claim or Interest against the Debtors receiving at least as much value from any winning auction bid as under the Plan.**

> In the event an alternative or amended Plan is filed and provides for recoveries to any Class that is deemed to reject the proposed Plan, the Debtors may be required to extend the solicitation period.

## C.     SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The Plan organizes Sbarro's creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes (a) the underlying "Claim" or "Equity Interest," (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is "Impaired" under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form

---

[2]     This amount assumes that the DIP Facility is fully drawn; this amount is intended to be the then-current sum of the Prepetition First Lien Lender Claims and the DIP Facility Claims.

of consideration (*e.g.*, Cash, stock or a combination thereof), if any, that such Holders will receive on account of their respective Claims or Equity Interests.

The table below summarizes the classification, treatment and estimated recoveries of Claims and Equity Interests under the Plan, as well as under a liquidation pursuant to chapter 7 of the Bankruptcy Code. A more detailed description of the classification and treatment of Claims and Interests is set forth in Article IV.B of this Disclosure Statement.

As demonstrated in the liquidation analysis attached hereto as **Exhibit D** (the "*Liquidation Analysis*"), with respect to each Class of creditors, recoveries are equal to or greater under the Plan than through a hypothetical chapter 7 liquidation. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.

The information in the table below is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan. Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Estimated Aggregate Amount of Allowed Claims or Interests | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan | Estimated Percentage Recovery of Allowed Claims or Interests under Chapter 7 Liquidation |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $[___] | 100% | 100% |
| 2 | Other Secured Claims | Unimpaired | $[___] | 100% | 100% |
| 3 | Prepetition First Lien Lender Claims | Impaired | $176.2 million | [___]% | [___]% |
| 4 | Prepetition Second Lien Lender Claims | Impaired | $34.2 million | 0% | 0% |
| 5 | Unsecured Ongoing Operations Claims | Impaired | $[___] | [$250,000 / ___]% | [___]% |
| 6 | General Unsecured Claims | Impaired | $[___] | 0% | 0% |
| 7 | Equity Interests in Sbarro Holdings, LLC | Impaired | N/A | 0% | 0% |
| 8 | Intercompany Interests | Unimpaired | N/A | 0% | 0% |

## D.     VOTING ON THE PLAN

On _____, 2011, the Bankruptcy Court entered the Solicitation Procedures Order by which the Bankruptcy Court approved, among other things, procedures and documents for the solicitation of acceptances on the Plan, certain key dates and deadlines relating to the voting and Confirmation, and procedures for tabulating votes.

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS A SUMMARY.**
> PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER ATTACHED HERETO AS **EXHIBIT B** FOR A COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

### 1.     Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3 and 5 (the "*Voting Classes*") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from (a) Holders of Claims in Classes 1 and 2 or Holders of Intercompany Interests in Class 8 because such Holders are conclusively presumed to accept the Plan under section

1126(f) of the Bankruptcy Code or (b) Holders of Claims Classes 4 and 6 or Holders of Equity Interests in Sbarro Holdings, LLC in Class 7 because such Holders are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition First Lien Lender Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Second Lien Lender Claims | Impaired | Deemed to Reject |
| 5 | Unsecured Ongoing Operations Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Sbarro Holdings, LLC | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept |

For a more detailed description of the Classes of Claims and the Classes of Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

### 2. Voting Record Date

**The Voting Record Date is _____, 2011**.  The Voting Record Date will determine (a) which Holders of Claims in Classes 3 and 5 are entitled to vote to accept or reject the Plan and (b) whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim by the Voting Record Date.

### 3. Voting on the Plan

**The Voting Deadline is 4:00 p.m. prevailing Eastern Time on _____, 2011**.  In order to be counted as votes to accept or reject the Plan, **all** Ballots must be properly executed, completed and delivered (either by using the return envelope provided or by first class mail, overnight courier or personal delivery) so that each Ballot is *actually received* on or before the Voting Deadline by the Notice and Claims Agent at the address below:

---

Ballots must be actually received by the Notice and Claims Agent
by the Voting Deadline by using the envelope provided or by first class mail to:

**Sbarro, Inc. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**P.O. Box 5014, FDR Station**
**New York, NY 10150-5014**

Or by overnight courier or personal delivery to:

**Sbarro, Inc. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**
**New York, New York 10017**

---

### 4. Ballots Not Counted

**The following Ballots will not be counted toward Confirmation of the Plan:**  (a) any Ballot by the Notice and Claims Agent after the Voting Deadline, unless the Debtors shall have granted in writing an extension of the Voting Deadline with respect to such Ballot; (b) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (c) any Ballot cast by an Entity that (i) does not hold a Claim in

a Class that is entitled to vote on the Plan or (ii) is not otherwise entitled to vote pursuant to the procedures described herein; (d) any Ballot sent to the Debtors, the Debtors' agents and/or representatives (other than the Notice and Claims Agent), the indenture trustee for the Debtors' senior subordinated notes or the Debtors' financial or legal advisors; (e) any unsigned Ballot; (f) any Ballot that is received by the Notice and Claims Agent by facsimile or other means of electronic transmission; or (g) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

## E.     ADDITIONAL PLAN-RELATED DOCUMENTS

### 1.      Filing the Plan Supplement

The Debtors will file the Plan Supplement with the Bankruptcy Court on or before the date that is 10 days prior to the Voting Deadline.  The Notice and Claims Agent will serve the 2002 List and Master Service List with a courtesy notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained.  The Plan Supplement will include, without limitation:

- the Exit Credit Documents;

- the lists of Executory Contracts and Unexpired Leases to be assumed and rejected;

- the Shareholders Agreement;

- the Certificate of Incorporation;

- the Bylaws;

- to the extent known, the identity of the members of the New Board; and

- the form of Management Compensation Plan.

### 2.      Filing the Contract/Lease Schedule

The Debtors will file a schedule or schedules, each as necessary and reasonably acceptable to the Prepetition First Lien Steering Committee, listing the Executory Contracts and Unexpired Leases the Debtors intend to assume and those the Debtors intend to reject pursuant to Article V.A of the Plan (the "***Contract/Lease Schedule***") with the Bankruptcy Court on or before the date that is 10 days prior to the Voting Deadline.  The Contract/Lease Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, a proposed cure amount, if any.

On or as soon as practicable thereafter, with the assistance of the Notice and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule must be filed with the Bankruptcy Court and served so as to be *actually received* on or before the Plan Objection Deadline (as defined below) by the notice parties listed in directly below in Article I.F.1 in a manner consistent with the Bankruptcy Court's *Order Establishing Certain Notice, Case Management and Administrative Procedures* [Docket No. 145] (the "***Case Management Order***").

Any counterparty to any Executory Contract or Unexpired Lease who fails to timely file and serve an objection in accordance with same will be deemed to have consented to the assumption or rejection of their respective Executory Contract or Unexpired Lease by the Debtors in accordance with Article V of the Plan.

## F.    CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Plan Objection Deadline

**The "Plan Objection Deadline" is 4:00 p.m. prevailing Eastern Time on _____, 2011**.  This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served, in accordance with the Case Management Order, so as to be *actually received* on or before the Plan Objection Deadline by the following parties (as well as to the chambers of the Honorable Shelley C. Chapman, United States Bankruptcy Judge):

- The Debtors:  Sbarro, Inc., Attn: Stuart Steinberg, 401 Broadhollow Road, Melville, New York 11747;

- Counsel to the Debtors:  Kirkland & Ellis LLP, Attn:  Edward O. Sassower and Nicole L. Greenblatt, 601 Lexington Avenue, New York, New York  10022;

- Special Counsel to the Debtors:  Curtis, Mallet-Prevost, Colt & Mosle LLP, Attn:  Steven J. Reisman, 101 Park Avenue, New York, New York  10178;

- Counsel to the Agent for the Prepetition First Lien Lenders and DIP Lenders:  Davis Polk & Wardwell LLP, Attn: Timothy Graulich and Steven Krause, 450 Lexington Avenue, New York, New York 10017;

- Counsel to the Prepetition Second Lien Lenders:  Quinn Emanuel Urquhart & Sullivan, LLP, Attn: Susheel Kirpalani and Daniel Holzman, 51 Madison Avenue, 22nd Floor, New York, New York 10010;

- Counsel to the Creditors' Committee:  Otterbourg, Steindler, Houston & Rosen, P.C., Attn:  Scott L. Hazan and David M. Posner, 230 Park Avenue, New York, New York  10169.

- Indenture Trustee for the Senior Notes:  The Bank of New York, Attn: Corporate Trust Division, Corporate Finance Unit, 101 Barclay Street, SW, New York, New York, 10286;

- Counsel to the Ad Hoc Group of Certain Holders of the Senior Notes:  Sullivan & Cromwell LLP, Attn:  Andrew G. Dietderich, 125 Broad Street, New York, New York, 10004; and

- United States Trustee:  Office of the United States Trustee for the Southern District of New York, Attn:  Elisabetta Gasparini and Paul K. Schwartzberg, Whitehall Street, 21st Floor, New York, New York 10004.

### 2.    Confirmation Hearing

**The Confirmation Hearing is scheduled to commence on _____, 2011, at __:__ .m. prevailing Eastern Time.**  The Confirmation Hearing will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408.

**The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Master Service List and the Entities who have filed objections to the Plan, without further notice to parties in interest.**  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may

put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 3. Effect of Confirmation and Consummation of the Plan

Following Confirmation, subject to Article VIII of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX of the Plan will become effective. As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and consummation of the Plan — which effectuates such provisions — will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly. **Additionally, for a more detailed description of the provisions set forth in Article IX of the Plan, please refer to Article IV.H herein, entitled "*Release, Injunction and Related Provisions*."**

---

**IF CONFIRMED, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

---

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

## II.    BACKGROUND TO THESE CHAPTER 11 CASES

### A.    THE DEBTORS' BUSINESS

#### 1.    Company History and Corporate Structure

In the 55 years since the Sbarro family opened their first Italian restaurant in Brooklyn, New York, Sbarro has grown into the world's premier owner, operator and franchisor of Italian quick service restaurants ("*QSRs*")[3] and the largest mall-focused restaurant concept in the world — with over 5,000 employees and a global base of 1,045 restaurants in 42 countries.  Under various brand names, the Debtors and their non-Debtor affiliates developed one of the first quick-service restaurant concepts that extended beyond offering one primary specialty item, such as pizza or hamburgers.  Today, Sbarro restaurants feature a menu of popular Italian food, including pizza, pasta, other hot Italian entrees, salads, drinks and desserts.

In 1985, with a base of 83 company-owned stores and 53 franchised restaurants, Sbarro went public, offering shares of its common stock on the New York Stock Exchange, and began a period of rapid growth correlating with the expansion of shopping malls.  On September 28, 1999, members of the Sbarro family (who owned approximately 34.4% of Sbarro's common stock) obtained 100% of the issued and outstanding common stock through a "going-private" transaction.

In January 2007, MidOcean Partners III, L.P. and certain of its affiliates ("*MidOcean*"), a leading private equity investment firm, acquired Sbarro and its affiliates from the Sbarro family for a purchase price of $466 million (the "*Acquisition*").  The timeline below generally depicts the sequence of events described above.

| | |
|---|---|
| **1956** | Opening of original Sbarro in Brooklyn, NY. |
| **1967** | First mall-based location at King's Plaza. |
| **1977** | Sbarro, Inc. organized. |
| **1985** | IPO with 83 company-owned and 53 franchised units. |
| **1999** | Take-private transaction by the Sbarro family. |
| **2007** | Acquired by MidOcean. |

As part of the Acquisition, Sbarro Holdings, LLC ("*Holdings*") became and is currently a wholly-owned subsidiary of MidOcean SBR Holdings, LLC (*"SBR Holdings"),* which is the sole member of Holdings.  MidOcean owns approximately 76% of SBR Holdings, with the remaining equity in SBR Holdings held by Sbarro's current and former senior managers and other institutional investors.  Holdings, in turn, owns 100% of the outstanding common stock of Sbarro, Inc., the Debtors' primary operating subsidiary.

Sbarro, Inc. employs all of the Debtors' employees and is responsible for all corporate overhead and support functions, including legal, accounting, marketing, finance, purchasing and information technology activities, and is also party to the vast majority of the Debtors' operating leases,  supply agreements and franchise agreements. The subsidiary operating entities are generally organized around certain branded restaurant "concepts" (as further described below) and/or to hold certain operating leases or liquor licenses in states that require separate incorporation for such purposes.

A chart illustrating the Debtors' prepetition corporate and capital structure is attached hereto as **Exhibit E**.

#### 2.    Current Businesses and Operations

The Debtors are the world's leading Italian QSR concept and the largest shopping-mall focused restaurant concept, with approximately 449 QSR locations, 554 franchised locations, and 16 domestic and international joint

---

[3]    QSRs consist of food-court and in-line restaurants which are generally cafeteria-style, self-serve restaurants.

ventures. The Debtors' global QSR and casual dining restaurant brands are organized under two business segments: (1) the company-owned restaurant segment, which consists of wholly-owned QSRs, casual-dining restaurants, and certain joint venture QSRs (the "***Company Segment***") and (2) the franchise restaurant segment which consists entirely of franchisee-owned domestic and international QSRs (the "***Franchise Segment***").

Notwithstanding current world-wide economic conditions, the Debtors' business segments, as a whole, remain profitable and competitive. In 2010, annual gross sales and adjusted EBITDA of the Debtors were approximately $330 million and $38 million, respectively. Notably, the Company Segment drives the Debtors' profitability, representing less than half of the store base, but over 95% and 70% of the Debtors' sales and adjusted EBITDA, respectively.

        a.        *Company Segment*

The Company Segment comprises the Debtors' core domestic QSR business of stores located in high-pedestrian-traffic locations within North America, spanning 46 states, the District of Columbia and Canada. In addition, Sbarro has six full service casual dining restaurants that are included within the Company Segment. The following map depicts the geographical dispersion of the Debtors' domestic restaurant locations.



U.S. Locations

The Company Segment also includes approximately 16 joint venture or profit sharing QSR arrangements with strategic partners, both domestically and internationally. Over the last several years, the Debtors have entered into joint ventures opportunistically, to gain access to locations that otherwise would not be available to the Debtors for any number of reasons, including, for example, political or economic restrictions. The international joint ventures were undertaken as a market entry strategy for Japan and India and further joint ventures in overseas markets are not part of the go-forward business plan.

        b.        *Franchise Segment*

As noted above, the Franchise Segment currently represents a majority of the Debtors' global store base with approximately 554 franchised restaurants, including 203 domestic restaurants and 351 international restaurants. Internationally, the Debtors partner with experienced local operators who have the infrastructure and resources to grow the brand. Sbarro's key international markets include Russia, Turkey, Philippines and Mexico.

The majority of domestic franchised QSRs are operated by institutional food service companies and restaurant operators that manage entire food courts in high-pedestrian-traffic locations such as airports, universities and travel plazas. In addition, Sbarro has a large number of smaller individual franchisees who operate one or two locations primarily in malls. The Debtors do not provide deficit or any other financing to their franchised restaurants. The Debtors derive revenues from franchised locations from initial payments and continuing royalty payments based on a percentage of sales.

Franchised restaurants accounted for approximately $14 million in sales and approximately $10 million in adjusted EBITDA in fiscal year 2010, representing, approximately 5% and 27% of total sales and adjusted EBITDA, respectively. The Debtors expect modest growth in EBITDA from domestic franchises and strong growth in EBITDA from international franchises.

The Debtors' family-oriented restaurants offer cafeteria and buffet-style quick service designed to minimize customer waiting time. The Debtors' various restaurant concepts feature a diverse menu of popular Italian cuisine, including, pizza, pasta dishes, salads, sandwiches, beverages and desserts that offers a compelling alternative to traditional fast food. The Debtors' entrees generally range in cost between $4.99 and $7.99 with the average check price generally being $8.33 per customer transaction. Pizza — which is sold predominately by the slice at an average price of $3.74 per slice — accounts for almost half of food sales. The following chart depicts sales by food product for fiscal year 2010.

### 2010 Sales by Food Product



"Other" includes buffet, sides, salads, desserts, alcoholic beverages, breakfast, sandwiches and catering.

The Debtors' over 1,000 company-owned and franchised restaurants are generally open seven days a week for 10-to-12 hours a day. To ensure that they are able to provide customers with the freshest and highest quality products each day, the Debtors rely on a national distributor and also a network of regional and local food and beverage suppliers to make timely deliveries (multiple times per week and sometimes daily) to each of the Debtors' restaurants.

The Debtors' restaurants are typically managed by one general manager and one or two co-managers or assistant managers, depending on the size and location of the restaurant. In addition, the Debtors employ certain Directors of Operations who are responsible for the operations of 10 to 20 company-owned restaurants. These Directors recruit and supervise managerial staff and report to one of six Vice Presidents of Operations.

The Debtors' lease space and locate their restaurants in high-pedestrian-traffic locations, such as shopping malls, airports, casinos, universities and travel plazas to ensure they reach the greatest number of potential customers. The Debtors' restaurant locations are relatively concentrated with a handful of major national landlords. Approximately two-thirds of the Debtors' restaurants are leased with five major landlords, and leases with just two major landlords account for approximately 40% of the Debtors' restaurant base.

## B.    PREPETITION CAPITALIZATION AND INDEBTEDNESS

The Debtors' prepetition capital structure consists of first and second lien senior secured debt, senior unsecured notes and equity.  Prior to 2009, the Debtors only maintained first lien secured debt and unsecured notes.  As the Debtors experienced weakened financial performance through the economic downturn, the Debtors were in danger of breaching the maximum leverage covenant in the Prepetition First Lien Credit Facility.  In order to lower the leverage, the Debtors entered into a $25.5 million second lien debt facility and used $25 million of borrowings thereunder to repay $25 million of then outstanding first lien debt.  The second lien facility also reduced the Debtors' cash interest burden by approximately $4 million per year by permitting pay-in-kind interest for the first three years (as compared to the cash interest required by the $25 million of first lien debt that was repaid).  The rights and priorities of the first and second lien lenders are governed, in part, by an intercreditor agreement among these lenders.

As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $368.2 million, consisting primarily of: (a) approximately $176.2 million in secured debt under their first lien senior secured credit facility, including $3.5 million in outstanding letters of credit; (b) approximately $34.2 million in secured debt under their second lien credit facility, plus fees, costs and certain other charges; and (c) approximately $157.8 million in senior notes (inclusive of the $8 million of missed interest payments due March 2011).

### 1.    Prepetition First Lien Credit Facility

The Prepetition First Lien Credit Facility provided the Debtors with a $25 million revolving line of credit — including a $10 million letter of credit subfacility and a $5 million swing-line subfacility — and a $183 million term loan.  Pursuant to an amendment to the Prepetition First Lien Loan Documents dated March 26, 2009, and in connection with the Debtors' entry into the Prepetition Second Lien Credit Agreement, the amount of the Debtors' revolving facility was reduced to $21.5 million and the term loan was paid down to $158 million.  The revolving loan facility was fully drawn on the Petition Date.

In addition to revolving and term loans, the Debtors have approximately $3.5 million in outstanding letters of credit pursuant to the Prepetition First Lien Credit Facility.  Debt obligations under the Prepetition First Lien Credit Facility accrue interest, at the Debtors' option, at either (a) the LIBOR rate plus 4.5% or (b) an alternative base rate plus 3.5%.  As a result of the event of default that occurred under the Prepetition First Lien Credit Facility on January 3, 2011, the interest rate for the loans under the Prepetition First Lien Credit Facility increased by 2% per annum.  The annual interest expense under the Prepetition First Lien Credit Facility is approximately $8.3 million.

All obligations under the Prepetition First Lien Credit Facility are guaranteed by Sbarro Holdings, LLC and certain of Sbarro, Inc.'s domestic subsidiaries (collectively, the "***Prepetition Guarantors***"), all of which are Debtors in these Chapter 11 Cases.  The Debtors' Prepetition First Lien Credit Facility obligations, including the guarantees thereof, are secured by a first priority security interest in substantially all the assets and capital stock of Sbarro, Inc. and the Prepetition Guarantors, as well as up to 65% of the outstanding capital stock of Sbarro, Inc.'s foreign subsidiaries.  The Prepetition First Lien Credit Facility matures on (a) January 31, 2014, as to the outstanding term loans and (b) January 31, 2013, as to the outstanding revolving loans.  The Prepetition First Lien Credit Facility contains a financial covenant that required the Debtors to maintain at least $43 million of consolidated EBITDA at the end of the fourth quarter of 2010.  In light of weaker than expected performance in the fourth quarter of 2010, the Debtors did not generate consolidated EBITDA sufficient to satisfy this covenant, leading them to default under the Prepetition First Lien Credit Facility.  As further described below, to provide time to facilitate an orderly restructuring of their debt obligations, the Debtors entered into three forbearance agreements with the Prepetition First Lien Lenders.

### 2.    Prepetition Second Lien Credit Agreement

The Prepetition Second Lien Credit Agreement provided the Debtors with $25.5 million (including OID) in second lien secured term loans.  Debt obligations under the Prepetition Second Lien Credit Agreement accrue interest at a rate of 15%, which is payable in kind for the first three years (*i.e.*, through March 2012).  As of the Petition Date, as a result of accrued pay-in-kind interest since March 2009, the Debtors' outstanding principal

obligations under the Prepetition Second Lien Credit Agreement total approximately $34.2 million. Approximately 95% of these outstanding obligations are held by an affiliate of MidOcean.

All obligations under the Prepetition Second Lien Credit Agreement are guaranteed by the Prepetition Guarantors. The Debtors' obligations under the Prepetition Second Lien Credit Agreement, including the guarantees thereof, are also secured by a second priority perfected security interest in substantially all the assets and capital stock of Sbarro and its domestic subsidiaries, as well as up to 65% of the outstanding capital stock of Sbarro's foreign subsidiaries. The Prepetition Second Lien Credit Agreement matures on July 31, 2014.

### 3. Intercreditor Agreement

On March 26, 2009, the collateral agent for the Prepetition First Lien Lenders and the collateral agent for the Prepetition Second Lien Lenders entered into an intercreditor agreement that, among other things, assigned relative priorities to claims arising under the Prepetition First Lien Credit Facility and the Prepetition Second Lien Credit Agreement (the "*Intercreditor Agreement*"). Among other things, the Intercreditor Agreement provides that liens and security interests provided to the Prepetition Second Lien Lenders on collateral are subordinate to the liens and security interests provided to the Prepetition First Lien Lenders on that same collateral. The Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Prepetition Second Lien Lenders so long as obligations under the Prepetition First Lien Credit Facility remain outstanding; (b) the Prepetition Second Lien Lenders' ability to challenge or contest the validity or priority of liens arising under the Prepetition First Lien Credit Facility; and (c) the Prepetition Second Lien Lenders' ability to propose or support a plan of reorganization that does not repay the First Lien Credit Facility in full in Cash on the Effective Date.

### 4. Senior Notes

At the time of the Acquisition, Sbarro also issued $150 million in unsecured Senior Notes, which mature on February 1, 2015. The Senior Notes Indenture provides that the Senior Notes rank equally in right of payment with all of the Debtors' existing and future senior unsecured indebtedness. The Senior Notes are junior in right of payment to all of the Debtors' secured indebtedness with respect to proceeds of the collateral securing such indebtedness.

The Senior Notes accrue interest at the rate of 10.375% *per annum*, payable semi-annually in arrears on February 1 and August 1 of each year. Due to liquidity constraints, the Debtors were not able to make the interest payment due February 1, 2011 and the grace period for such payment expired March 3, 2011. Ares Corporate Opportunities Fund II, L.P. and certain of its affiliates ("*Ares*") hold more than two thirds of the outstanding principal amount of the Senior Notes.

## C. RESTRUCTURING INITIATIVES AND EVENTS LEADING TO CHAPTER 11

### 1. Adverse Economic Conditions and Prepetition Restructuring Initiatives.

Although the Debtors are improving operationally and are currently generating positive same store sales, their existing capital structure — put in place during a frothy economic climate — left little flexibility for the Debtors to navigate through a series of adverse economic developments and is incompatible with current operations and the long term business plan. Since Sbarro was acquired and capitalized in 2007, it has faced a significant decline in same store sales, operating income, and adjusted EBITDA. These significant declines in key financial metrics have limited the Debtors' ability to expend capital for operational improvements while simultaneously servicing their substantial debt load. The chart below depicts the Debtors' same store sales and adjusted EBITDA trends from 2007 to 2010:



2007 - 2010 Same Store Sales and EBITDA

Because the Debtors' business is sensitive to consumer discretionary spending activity, macroeconomic conditions that impact consumer demand — *e.g.*, interest rates, unemployment levels, consumer confidence and credit availability — also affect profitability. Steep reductions in consumer traffic at shopping malls during 2008 and 2009 (where a majority of the Debtors' stores are located) and increased food-court competition have weakened the Debtors' financial performance in the last few years. Prior to that, increases in the price of cheese and flour beginning with a surge in 2007-2008, resulted in higher costs and reduced margins, which left Sbarro with reduced earnings entering into the global economic crisis beginning in the fourth quarter of 2008.

As described above, as performance lagged relative to modest improvements in mall traffic throughout 2010, the Debtors focused on developing their strategic five-year business plan and began to reinvest in the business through a number of initiatives. Operationally, the Debtors have focused on three key areas of development: (1) overhauling their base business with operational and menu improvements; (2) facilitating a brand revitalization; and (3) bolstering their franchise business.

- Base Business: Base business improvements and initiatives include significant investments in human resources, with the addition of new leadership, the development of a unified vision for the Debtors, and reinvestment in field support functions such as training and hiring. The Debtors have focused on menu quality and clarity with the elimination of underperforming items, as well as overall improvements in food quality. Notably, a key factor in the Debtors' recovery has been a renewed focus on food variety and display; accordingly it is essential that the Debtors continue to engage with manufacturers and suppliers to obtain the highest quality fresh food.

- Brand Revitalization: The Debtors have undertaken a comprehensive brand evaluation and, based on these findings, have developed a new store format that includes new menu items and a new design. To date, the company has opened four restaurants under this new format and believes this new format will be an important element in revitalizing the brand.

- Franchise: The franchise segment has been, and continues to be, an important area of development for the Debtors. The Debtors have been focused on developing their international presence in a targeted number of countries by entering into development agreements with experienced restaurant operators.

These initiatives had begun to take hold before the Petition Date, with the Debtors experiencing positive same store sales and outpacing mall traffic through July 2011. The Debtors expect to realize the full benefits from

these initiatives and anticipated capital expenditures over their five-year business plan horizon, which forecasts an improvement in adjusted EBITDA from approximately $28 million in 2011 to more than $45 million by 2015.[4]

Despite signs of a turnaround in 2011, the Debtors' profitability for fiscal year 2010 fell below the covenant level in their Prepetition First Lien Credit Facility and the resulting default prompted the Debtors' entry into the first of three forbearance agreements with their Prepetition First Lien Lenders.  As news of the Debtors' covenant defaults and worsening financial condition spread, pressure from suppliers for cash on delivery or cash in advance, together with increased restructuring costs, increased cash requirements and tightened liquidity in the weeks leading to commencement of these Chapter 11 Cases.  In light of certain capital constraints and to preserve liquidity, the Debtors did not make an interest payment due on March 3, 2011 to holders of Senior Notes.

## 2. Prepetition Marketing Efforts and Development of Plan Support Agreement

In the months prior to the Petition Date, the Debtors, together with their advisors, carefully considered all available restructuring alternatives and engaged in extensive discussions and negotiations with their key constituencies, including their major Prepetition Second Lien Lender (MidOcean), the holder of a majority of the outstanding amount of the Senior Notes (Ares) and the Prepetition First Lien Steering Committee.  For several months prior to the Petition Date, each stakeholder group conducted significant diligence related to the Debtors' business plan and growth prospects.  Although the Debtors have always sought to achieve a fully consensual restructuring solution, early discussions and preliminary proposals received from the parties made clear that the Debtors' stakeholders had different ideas about how to restructure the Debtors and that, absent a consensual resolution, the Debtors could be mired in litigation.

While continuing discussions with their stakeholders, the Debtors also instructed Rothschild Inc. ("***Rothschild***"), the Debtors' financial advisor and investment banker, to market the Debtors' business to potential third party buyers.  Rothschild developed a marketing strategy and, beginning in mid to late February of 2011, began contacting a broad group of 95 potential acquirers, including 17 strategic buyers and 78 financial buyers. Twelve potential investors signed confidentiality agreements with the Debtors, and discussions with several of these parties remain ongoing.  At around the time that preliminary indications of interest were due in early March 2011, the Debtors received a proposal from MidOcean and Ares for a comprehensive de-leveraging transaction that would equitize all of the second lien and bond debt, provide the reorganized business with $30 million of new equity and establish a joint governance structure among two first tier private equity funds.  Because an agreement among the Debtors' incumbent stakeholders to convert debt to equity presented an attractive restructuring solution, the Debtors postponed further marketing efforts, though Rothschild continued to maintain lines of communication with certain interested parties, and instead the Debtors focused on negotiating and documenting a plan support and equity commitment agreement reflecting the MidOcean/Ares restructuring proposal (the "***Prepetition Agreements***").

The Debtors were not able to secure support from their Prepetition First Lien Lenders for the Prepetition Agreements because the lenders believed that outstanding debt should be paid down substantially more than contemplated by such agreements.  As negotiations among the stakeholders for a fully consensual deal reached an impasse, the Debtors' liquidity continued to weaken and their Prepetition First Lien Lenders focused their efforts on negotiating the terms of debtor-in-possession financing that would provide the Debtors with necessary liquidity to fund operations in chapter 11.

On April 4, 2011, the Debtors commenced these Chapter 11 Cases to access their DIP Facility and to expeditiously confirm and consummate a partially prearranged plan of reorganization predicated upon an equitization of existing second lien and bond debt and a $30 million new money investment from the sponsors.  The Prepetition Agreements required that the Debtors file and confirm a plan of reorganization within 145 days.

---

[4] As discussed further in Article III.D below, since the Petition Date, the Debtors have continued to analyze results from operations and have reforecast projections from their original five-year business plan.  The Debtors' current financial projections are attached hereto as **Exhibit C**.

## III. SBARRO'S CHAPTER 11 CASES AND DEVELOPMENTS THEREIN

### A. FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF

Immediately following the Petition Date, to ensure they maintained uninterrupted operations while conducting their restructuring plan process, the Debtors devoted substantial efforts to preserving their relationships with vendors, customers, employees, landlords and utility providers that had been or could have been impacted by the commencement of these Chapter 11 Cases. As a result of these initial efforts, the Debtors minimized the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "*First Day Motions*") with the Bankruptcy Court. Within a few days, the Bankruptcy Court entered several orders to, among other things: (1) prevent interruptions to the Debtors' businesses; (2) ease the strain on the Debtors' relationships with certain essential constituents; (3) provide access to much needed working capital; and (4) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases (each, a "*First Day Order*").

#### 1. Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural First Day Orders: (a) approving the notice, case management and administrative procedures to govern the Debtors' Chapter 11 Cases [Docket No. 145]; (b) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket No. 37]; (c) allowing the Debtors to prepare a list of creditors and file a consolidated list of the Debtors' 40 largest unsecured creditors [Docket No. 42]; and (d) granting the Debtors an extension of time to file their Schedules [Docket No. 45]. On May 4, 2011, the Debtors filed their Schedules with the Bankruptcy Court.

#### 2. Debtor-in-Possession Financing

To ensure necessary operating liquidity for the duration of these Chapter 11 Cases, the Debtors filed a First Day Motion to approve the DIP Facility, a senior secured superpriority postpetition debtor-in-possession term loan facility in the aggregate amount of $35 million provided by certain Prepetition First Lien Lenders. On the closing date of the DIP Facility and pursuant to interim Bankruptcy Court approval granted on April 5, 2011 [Docket No. 48], the Debtors received immediate access to an initial $16.5 million. Pursuant to the Final Order authorizing the DIP Facility, entered on May 4, 2011 [Docket No. 163], the remaining $18.5 million of the DIP Facility was made available to the Debtors as delayed-draw term loans. This Final First Day Order included authority to use the Prepetition First Lien Lenders' cash collateral and granting certain adequate protection to such lenders in their capacity as Prepetition First Lien Lenders. On May 24 and May 31, 2011, borrowings under the DIP Facility were made in the amount of $3.5 million and $7.5 million, respectively, leaving $7.5 million in available funds under the DIP Facility.

#### 3. Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period, could negatively impact supplier and customer relationships, the Debtors' goodwill and brand assets, and revenue and profits, the Debtors filed a number of First Day Motions to ensure a stabilization of operations. Thereafter, the Bankruptcy Court entered a number of First Day Orders granting the Debtors the authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs. Indeed, the relief granted by the First Day Orders helped facilitate the Debtors' smooth transition into the Chapter 11 Cases, allowed the Debtors to continue their operations without interruption and prevented a decrease in confidence among suppliers, customers and creditors as to the likelihood of the Debtors' successful emergence from the Chapter 11 Cases.

K&E 19518290

a.      *Critical Trade Vendors*

The Debtors rely on a number of vendors to provide them with food, supplies and other goods necessary to operate their businesses and provide their customers with the high-quality Italian food expected under the Sbarro brand.  Disruption of the supply of these goods and supplies would disrupt the Debtors' business and impair the Debtors' ability to reorganize.  Therefore, the Bankruptcy Court entered a First Day Order granting the Debtors the authority to pay certain vendors and claimants on an interim basis on April 5, 2011 [Docket No. 39] and on a final basis on May 4, 2011 [Docket No. 162].  Specifically, the Bankruptcy Court permitted the Debtors to pay: (i) critical vendors for goods ordered with 20 days of the Petition Date pursuant to section 503(b)(9) of the Bankruptcy Code, (ii) vendors who might assert liens for nonpayment, and (iii) vendors of fresh produce who may be able to assert claims or liens under the Perishable Agricultural Commodities Act of 1930, each up to certain caps and in an aggregate amount not to exceed $5.2 million.  The Debtors believe this critical vendor authority has limited disruption to necessary goods and supplies, as well as to the Debtors' business.

b.      *Wages*

The Debtors rely on their employees for their day-to-day business operations.  These employees perform a variety of critical functions including food preparation, sales, customer service, purchasing, information technology and a variety of administrative, legal, accounting, finance and management related tasks.  The skills and experience of these employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations and ability to effectively reorganize their businesses.  The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses, and these employees would have been exposed to significant financial difficulties if the Debtors were not permitted to continue paying their employees compensation, providing their employees benefits and maintaining certain programs benefiting their employees.  Accordingly, the Bankruptcy Court entered a First Day Order  [Docket No. 46] and then, on May 4, 2011, a Final Order [Docket No. 171] authorizing the Debtors to pay and continue, among other amounts, prepetition claims and to pay and continue obligations for (i) compensation, (ii) reimbursable expenses and (iii) employee benefit programs, as well as ordinary course operation of the Debtors' workers compensation program.

c.      *Taxes and Fees*

In the ordinary course of business, the Debtors:  (a) incur and/or collect taxes, including sales, use, franchise, income, unemployment and other taxes in the operation of their business; (b) incur regulatory, permit, inspection and other similar fees and assessments in connection with obtaining licenses and permits necessary to operate their business; and (c) remit such taxes and fees to various taxing, licensing and other governmental authorities.  The Debtors believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes and fees.  Therefore, the Debtors felt that it was in their best interests to eliminate the possibility of any unnecessary distractions.  Accordingly, the Debtors sought an order authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations.  On April 5, 2011, the Bankruptcy Court entered an interim order [Docket No. 43] and, on May 4, 2011, a Final Order [Docket No. 170] authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations.

d.      *Insurance Coverage*

In the ordinary course of business, the Debtors maintain a number of active insurance policies that are maintained and administered by several third party insurance carriers.  Collectively, these policies provide coverage for, among other things, general commercial liability, commercial automobile liability, commercial equipment liability, and directors and officers liability.  Continuation of these insurance policies during the Chapter 11 Cases is essential to the preservation of the Debtors' businesses, property and assets.  In many cases, the diverse regulations, laws and contracts that govern the Debtors' commercial activities require certain insurance coverage.  Accordingly, the Bankruptcy Court granted the Debtors authority to maintain their insurance policies in the ordinary course of business on May 4, 2011 [Docket No. 146].

K&E 19518290

*e.* *Cash Management Systems*

The Debtors maintain a company-wide cash management system to collect, track, aggregate and disburse cash on a daily basis. As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered First Day and Final Orders authorizing the Debtors to continue using their existing cash management system, bank accounts and business forms and to continue intercompany transactions [Docket Nos. 41, 161].

*f.* *Utilities*

The Debtors contract with hundreds of utilities for the provision of, among other things, water, gas, electricity and telecommunications services. Any interruption of utility services, even for a brief period of time, would seriously jeopardize the Debtors' operations, customer relationships, revenues and profits, the Debtors' reorganization efforts and, ultimately, the Debtors' going-concern value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases. Consequently, the Debtors filed a First Day Motion approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court. On May 3, 2011, the Bankruptcy Court entered an order approving the relief requested in this motion [Docket No. 158], which order provided for the Debtors to deposit $240,000, representing approximately two weeks of utility service, into a segregated account to provide adequate assurance to utility providers.

*g.* *Customer Programs*

Prior to the Petition Date, the Debtors maintained certain customer programs to maintain customer loyalty, drive additional sales volume and access special market opportunities. The continuation of these customer programs and retention of core customers is a critical element of the Debtors' successful reorganization. Accordingly, the Debtors filed a First Day Motion seeking authority to continue their customer programs and honor the prepetition commitments owed with respect thereto. The Bankruptcy Court entered an interim order on April 5, 2011 [Docket No. 49] and, on May 3, 2011, a Final Order [Docket No. 157] approving this motion.

**4.      Employment and Compensation of Advisors**

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders, authorizing the Debtors to retain and employ the following advisors: (a) Epiq Bankruptcy Solutions LLC, as notice and claims agent to the Debtors [Docket No. 44] and as administrative agent to the Debtors [Docket No. 149]; (b) PricewaterhouseCoopers LLP as bankruptcy consultants, independent auditors, tax consultants and international tax advisors to the Debtors [Docket No. 150]; (c) Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel to the Debtors [Docket No. 151]; (d) Cadwalader, Wickersham & Taft LLP as counsel to the restructuring committee of the Debtors' board of directors [Docket No. 152]; (e) Rothschild Inc. as financial advisor and investment banker to the Debtors [Docket No. 160]; (f) Marotta Gund Budd & Dzera, LLC, as special financial advisors to the Debtors [Docket No. 153]; (g) Steinberg, Fineo, Berger & Fischoff, P.C. as special counsel respect to general business matters of the Debtors [Docket No. 154]; and (g) Kirkland & Ellis LLP, as attorneys for the Debtors [Docket No. 155]. In addition, the Bankruptcy Court approved the Debtors' motion to retain and compensate certain professionals utilized in the ordinary course of the Debtors' business [Docket No. 148]. On May 3, 2011, the Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of Retained Professionals in the Chapter 11 Cases [Docket No. 147].

**5.      Appointment of the Committee and Committee Professionals**

On April 12, 2011, the U.S. Trustee appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (as amended from time to time, the "***Creditors' Committee***"). The Creditors' Committee members are: (a) GGP Limited Partnership; (b) Pepsico; (c) Performance Food Group, Inc. f/k/a Vistar Corporation; (d) Simon Property Group, Inc.; and (e) The Bank of

New York. The Creditors' Committee has retained Otterbourg, Steindler, Houston & Rosen, P.C. as counsel and Mesirow Financial Consulting LLC as its financial advisor in these Chapter 11 Cases.

## B. CERTAIN OPERATIONAL INITIATIVES DURING THE CHAPTER 11 CASES

### 1. Rejection of Unexpired Non-Residential Real Estate Leases and 365(d)(4) Extension

Prior to the Petition Date, the Debtors undertook to review the terms of their approximately 460 restaurant leases to optimize their performance and maximize the value of their enterprise by closing underperforming or otherwise unprofitable restaurants. The Debtors have continued their lease review strategy following the commencement of these Chapter 11 Cases and have sought rejection of those leases which the Debtors have determined to be no longer profitable. By order dated June 28, 2011, the Bankruptcy Court authorized the rejection of 11 such leases [Docket No. 305]. Further, by order dated July 26, 2011, the Bankruptcy Court extended the time to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including October 31, 2011 [Docket No. 402].

### 2. Employee Bonus Plan

By order dated June 28, 2011, the Bankruptcy Court authorized the Debtors to implement a bonus program to encourage the retention of and performance by certain of the Debtors' non-insider employees who the Debtors have determined are necessary to their reorganization efforts [Docket No. 306] ("***Employee Bonus Plan***"). The Debtors believe the Employee Bonus Plan is a critical aspect of their ability to stabilize their operations and maintain a highly motivated workforce for the duration of these Chapter 11 Cases.

## C. SUMMARY OF CLAIMS PROCESS AND BAR DATE

The Debtors filed their Schedules on May 4, 2011.

On May 26, 2011, the Bankruptcy Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Procedures for Filing Proofs of Claim and (III) Approving Notice Thereof* (the "***Bar Date Order***") [Docket No. 232], which set forth the following Claims Bar Dates by which Proofs of Claim must be filed:

1. Bar Date: July 8, 2011 at 5:00 p.m. prevailing Eastern Time; and

2. Government Bar Date: October 3, 2011 at 5:00 p.m. prevailing Eastern Time.

Subject to certain limited exceptions contained in the Bankruptcy Code and, other than Claims arising from the rejection of Executory Contracts after the Claims Bar Date, all Proofs of Claim must have been submitted by the applicable Claims Bar Date.

In accordance with the Bar Date Order, written notice of the Claims Bar Dates and the Proof of Claim form were mailed to, among others, all known Holders of actual or potential Claims and other parties listed in the Bar Date Order within four Business Days after the date of entry of the Bar Date Order. In addition, in accordance with the Bar Date Order, the Debtors published notice of the Claims Bar Dates in *The Wall Street Journal* and the *USA Today*. A deadline by which Proofs of Claim for Administrative Claims (except to the extent such Claims are asserted pursuant to section 503(b)(9) of the Bankruptcy Code, discussed above) are required to be filed with the Bankruptcy Court has not been established as of the date of this Disclosure Statement, and the Debtors will request that the Bankruptcy Court set an Administrative Claim Bar Date in connection with Confirmation of the Plan.

As of August 2, 2011, the Debtors' Notice and Claims Agent had received approximately 1,639 Claims. The total amounts of Claims filed against one or more of the Debtors were as follows: (1) 153 Secured Claims in the total amount of $2,000,953,149.23; (2) 266 Administrative Claims in the total amount of $1,889,151.45; (3) 183 Priority Claims in the total amount of $1,223,257.58; and (4) 1,377 Unsecured Claims in the total amount of $4,197,627,470.80. The Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative or overstated.

[The Debtors estimate that, at the conclusion of the Claims objection, reconciliation and resolution process, the aggregate amount of Claims will be as follows: (1) Allowed Administrative Claims will be approximately $_____; (2) Allowed Secured Claims will be approximately $_____; (3) Allowed Priority Claims will be approximately $_____; (4) Allowed General Unsecured Claims will be approximately $_____.]

The estimates set forth herein are approximate and based upon numerous assumptions and there is no guarantee that the ultimate amount of Claims will conform to these estimates. Numerous Claims have been asserted in unliquidated amounts. Further, additional Claims may be filed or identified during the Claims objection, reconciliation and resolution process that may materially affect the foregoing estimates. Although the Debtors believe that certain Claims are without merit and intend to object to all such Claims, there can be no assurances that these objections will be successful.

## D. DEVELOPMENTS RELATED TO THE PLAN OF REORGANIZATION

### 1. Termination of the Prepetition Agreements to Facilitate Diligence with Foreign Strategic Investor

As discussed above, prior to the Petition Date, the Debtors, with the assistance of Rothshild, solicited indications of interest for the Debtors' assets through a prepetition marketing effort. Immediately following the Petition Date and the public filing of the Debtors' Prepetition Agreements with Ares/MidOcean, a foreign strategic investor (the "***Foreign Strategic Investor***") that had submitted a non-binding proposal on or around March 11, 2011 sent several requests to Sbarro, the restructuring committee of Sbarro's board of directors (the "***Restructuring Committee***") and certain other stakeholders for access to Sbarro's electronic data room and management team to conduct due diligence for a potential acquisition proposal. On April 29, 2011, the Foreign Strategic Investor submitted a revised indication of interest for a transaction at a higher valuation than that implied by the Prepetition Agreements.

With the support of their key stakeholders, including Ares, MidOcean and the Prepetition First Lien Steering Committee, on May 19, 2011, the Debtors announced that they had terminated the Prepetition Agreements to preserve optionality and to explore other value-maximizing alternatives, including a potential transaction with the Foreign Strategic Investor.

Over the next several months, the Debtors engaged in extensive diligence with the Foreign Strategic Investor, providing access to the Debtors' online data room and supplemental data regarding the Debtors' operations, projections and business plan to facilitate its ability to develop a potential restructuring plan or to otherwise constructively participate in the process. The Debtors also participated in several in-person meetings and on-site visits with the Foreign Strategic Investor, and facilitated meetings among the Foreign Strategic Investor and the Debtors' various stakeholder groups in the hopes of developing a consensual restructuring transaction.

Despite having proposed an expedited timeline for submitting a binding proposal, as of the date hereof, the Debtors have not received any further proposals from the Foreign Strategic Investor although communication is ongoing.

### 2. Renewed Marketing Efforts and Selection of Stalking Horse Bidder

While continuing to pursue efforts with the Foreign Strategic Investor, over the past several months, the Debtors have also focused on updating their business plan and refining their analysis of current and future liquidity needs in order to develop materials to solicit plan sponsorship or acquisition bids from existing stakeholders and third parties, which culminated in the development of a revised business plan and the financial projections included in __Exhibit C__ (the "***Financial Projections***"). Throughout this time, the Debtors also engaged in ongoing discussions with their key stakeholders — the Prepetition First Lien Lenders, Prepetition Second Lien Lenders, Ares and the Creditors' Committee — to develop a path forward for maximizing the value of these estates while truncating the Debtors' stay in chapter 11 to minimize administrative expenses.

By the end of June 2011, having received no further proposals from the Foreign Strategic Investor, the Debtors undertook to re-evaluate their options in light of certain plan-related milestones under their DIP Facility. The Debtors, at the direction of the Restructuring Committee, focused on developing a competitive marketing process for maximizing the value of the Debtors' estates and determined that the most effective option was to implement a dual-track restructuring strategy in which the Debtors and their advisors would solicit a stalking horse proposal from the pool of incumbent stakeholders and the Foreign Strategic Investor while simultaneously marketing the company to third parties in anticipation of an auction to market test the stalking horse plan.

As a consequence of ongoing discussion with the Debtors' major stakeholders, in early July, the Prepetition First Lien Steering Committee submitted a non-binding proposal outlining terms under which it would invest in the Debtors and act as a plan sponsor (the "***Steering Committee Proposal***"). The Steering Committee Proposal provided for a debt-for-equity exchange that would eliminate $86.3 million in senior debt, provide specified terms for "take back paper" and ensure that the Reorganized Debtors would have $10 million of available Cash to fund ongoing operations and working capital needs. The Steering Committee Proposal provided no recovery for the second lien lenders or the general unsecured claimholders.

Over the next several weeks, the Debtors disseminated their reforecast business plan and continued to negotiate with and provide diligence to the Prepetition First Lien Steering Committee to further develop its proposal while concurrently pursuing discussions with their other creditor constituencies in the hopes of soliciting more favorable terms for a restructuring transaction. At the same time, Rothschild implemented a renewed marketing effort, transmitting a confidential information memorandum with the reforecast business plan to prospective bidders willing to sign confidentiality agreements. As part of a renewed third party marketing process, Rothschild resolicited interest form the 95 parties initially identified in February 2011 and approached additional third parties who had since contacted Rothschild or who were identified by Rothschild and other stakeholders. As a result of this effort, 13 parties have executed confidentiality agreements and engaged in confidential discussions with the Debtors.

To provide sufficient time to develop the Steering Committee Proposal and pursue discussions with other creditors regarding a potential plan transaction, the Debtors secured extensions of their deadline under the DIP Facility to file a plan of reorganization through August 10, 2011 [Docket Nos. 323, 396, 407 and 415].

After several weeks of negotiations with the Prepetition First Lien Steering Committee and other potential bidders and investors, the Debtors, with the assistance of their advisors and the Restructuring Committee, ultimately selected an improved version of the Steering Committee Proposal as their stalking horse restructuring plan. Notably, the Steering Committee's proposal is conditioned upon an auction process and includes an option for approved bidders to take advantage of so-called "stapled" financing with which to fund potentially higher and better offers.

### 3.  The Overbid Process

As part of their Plan approval process, the Debtors have also filed the Bidding Procedures Motion, which provides a mechanism for alternative bidders to "top" the stalking horse proposal submitted by the Prepetition First Lien Steering Committee currently embodied by the Plan. The bidding procedures ensure that the Plan will provide maximum recoveries to the Debtors' creditors by allowing interested bidders, including the multiple parties already engaged in diligence as part of the Debtors' marketing efforts, to submit a proposal on higher and better terms than the Steering Committee Proposal. If the Debtors receive proposals from alternative bidders seeking to top the Steering Committee Proposal, the Debtors will proceed with an auction with the goal of selecting a successful bidder as quickly as possible. The Debtors cannot state with certainty at this time whether alternative bidders will seek to participate in an auction.

## E.  EXCLUSIVITY

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Court for a period of up to 18 months from the petition date). If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Court for a period of up to 20 months from the petition date).

During these exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may extend these periods upon request of a party in interest and "for cause."

On July 12, 2011, the Debtors filed a motion seeking an extension of the exclusive periods by 120 days — from August 2, 2011 to November 20, 2011 for the filing of a plan and from October 1, 2011 to January 29, 2012 for soliciting acceptances of a plan [Docket No. 359]. As the Debtors continued to discuss the Plan process with their key stakeholders and to refine the appropriate timeline for selection of stalking horse bids and a related auction process, the parties agreed to support a 90-day extension of the exclusive periods. On July 26, 2011, the Bankruptcy Court granted the Debtors a 90-day extension of their exclusive periods to file a plan and solicit acceptance thereon [Docket No. 404].

## F.       THE PREPETITION SECOND LIEN LENDER ADVERSARY PROCEEDING

Prior to the Petition Date, on December 28, 2010, Ares served Sbarro with a notice of default alleging that the obligations under the Prepetition Second Lien Credit Agreement undertaken in March 2009 had been incurred in violation of the Senior Notes Indenture and reserving certain rights. Since the Petition Date, advisors for the Creditors' Committee have been conducting an investigation of the validity of the second lien debt and have solicited documents and correspondence from MidOcean, who has been voluntarily and cooperatively producing information to facilitate the Creditors' Committee's investigation. On July 22, 2011, the Prepetition Second Lien Lenders filed a complaint under the caption *Column Investments S.à.r.l. v. Sbarro, Inc., et al.*, Adv. Proc. No. 11-02421 (Bankr. S.D.N.Y. July 22, 2011) (SCC) initiating an adversary proceeding (the "***Adversary Proceeding***") and seeking a declaratory judgment with respect to the validity of the second lien debt and related liens. On August 3, 2011, the plaintiff and the Creditors' Committee entered into a stipulation authorizing the Creditors' Committee to intervene in the Adversary Proceeding. Answers to the complaint are due on August 22, 2011.

## IV.       SUMMARY OF THE JOINT PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.**

**The Plan itself and the documents therein control the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

## A.       ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES

### 1.       Administrative, DIP Facility and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified by the Plan and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## 2. Administrative Claims

### a. General Administrative Claims

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that, Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided further that Allowed General Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court).

### b. Professional Claims

#### i. Final Fee Applications

All final requests for Professional Fee Claims shall be filed no later than 45 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

#### ii. Payment of Interim Amounts

Except as otherwise provided in the Plan, Retained Professionals shall be paid pursuant to the Interim Compensation Order.

#### iii. Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals, including with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. Such funds in the Professional Fee Escrow Account shall not constitute property of the Reorganized Debtors. The remaining amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

#### iv. Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors on or before the Confirmation Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

v.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by that Reorganized Debtor or the Creditors' Committee after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and the Creditors' Committee.  If the Reorganized Debtors or Creditors' Committee dispute the reasonableness of any such invoice, the Reorganized Debtors, Creditors' Committee or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.  Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.  For the avoidance of doubt, except to the limited extent set forth in Article XII.N of the Plan, the Debtors shall have no obligation to pay any compensation or expense reimbursement for the Creditors' Committee or its Retained Professionals after the Effective Date and nothing herein should be construed to suggest otherwise.

vi.      Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise  required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

c.      *Administrative Claims Bar Date*

All requests for payment of an Administrative Claim (other than DIP Facility Claims or Prepetition First Lien Lender Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than 45 days after the Effective Date.  A notice setting forth the Administrative Claim Bar Date will be filed on the Bankruptcy Court's docket and posted on the Debtors' restructuring website.  Further notice of the Administrative Claims Bar Date will be included in the notice of the Confirmation Date and be provided as may be directed by the Bankruptcy Court.  No request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors may also choose to object to any Administrative Claim no later than 75 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.

Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**Any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall not appear on the Claims Register maintained by the Notice and Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.**

K&E 19518290

### 3. DIP Facility Claims

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims (other than Claims under the DIP Facility that expressly survive the termination thereof), on the Effective Date, the DIP Facility Claims shall (a) convert on a dollar for dollar basis into the Exit Term Loan Facility pursuant to the Exit Credit Documents or (b) receive such other treatment as agreed by the Debtors and the applicable DIP Lender.

### 4. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder; *provided, however,* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

### 5. United States Trustee Statutory Fees

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## B. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 1. Classification of Claims

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth in the Plan), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.[5] In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims, and Priority Tax Claims, as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

---

[5]    Distributions under the Plan are <u>not</u> on a Debtor by Debtor basis.

K&E 19518290

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition First Lien Lender Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Second Lien Lender Claims | Impaired | Deemed to Reject |
| 5 | Unsecured Ongoing Operations Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Sbarro Holdings, LLC | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |

2. **Treatment of Claims and Interests Against the Debtors**

   a. *Class 1 — Other Priority Claims*

      i. *Classification*: Class 1 consists of all Other Priority Claims against the Debtors.

      ii. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Priority Claim against the Debtors, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.

      iii. *Voting*: Class 1 is Unimpaired and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

   b. *Class 2 — Other Secured Claims*

      i. *Classification*: Class 2 consists of all Other Secured Claims against the Debtors.

      ii. *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the sole discretion of the applicable Debtor, shall (i) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive such other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

      iii. *Voting*: Class 2 is Unimpaired and Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

K&E 19518290

c. *Class 3 — Prepetition First Lien Lender Claims*

    i. *Classification*:  Class 3 consists of Prepetition First Lien Lender Claims against the Debtors.

    ii. Allowance:  On the Effective Date, Prepetition First Lien Lender Claims shall be deemed Allowed in the aggregate amount of $[176,300,000].

    iii. *Treatment*:  In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition First Lien Credit Agreement Claim, each Holder of an Allowed Prepetition First Lien Lender Claim shall receive its Pro Rata share of each of (i) the Exit Term Loan Facility and (ii) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution on account of Reserved Employee Equity and/or shares issued in connection with the Management Equity Plan).

        Existing Letters of Credit shall be replaced or cash collateralized with the proceeds of the New Money Exit Facility to the extent necessary.

    iv. *Voting*:  Class 3 is Impaired and Holders of Class 3 Prepetition First Lien Lender Claims are entitled to vote to accept or reject the Plan.

d. *Class 4 — Prepetition Second Lien Lender Claims*

    i. *Classification*:  Class 4 consists of all Prepetition Second Lien Lender Claims against the Debtors.

    ii. *Treatment*:  Holders of Prepetition Second Lien Lender Claims shall not receive any distribution on account of such Prepetition Second Lien Lender Claims.  On the Effective Date, all Prepetition Second Lien Lender Claims shall be discharged.

    iii. *Voting*:  Class 4 is Impaired and Holders of Class 4 Prepetition Second Lien Lender Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 4 Prepetition Second Lien Lender Claims are not entitled to vote to accept or reject the Plan.

e. *Class 5 — Unsecured Ongoing Operations Claims*

    i. *Classification*: Class 5 consists of all Unsecured Ongoing Operations Claims against the Debtors.

    ii. *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of such Unsecured Ongoing Operations Claim, each Holder of an Allowed Unsecured Ongoing Operations Claim shall receive its Pro Rata share of the Unsecured Ongoing Operations Distribution.

    iii. *Voting*:  Class 5 is Impaired and Holders of Class 5 Unsecured Ongoing Operations Claims are entitled to vote to accept or reject the Plan.

K&E 19518290

f.      *Class 6 — General Unsecured Claims*

   i.      *Classification*: Class 6 consists of all General Unsecured Claims against the Debtors.

   ii.     *Treatment*:   Holders of General Unsecured Claims shall not receive any distribution on account of such General Unsecured Claims.   On the Effective Date, all General Unsecured Claims shall be discharged.

   iii.    *Voting*: Class 6 is Impaired and Holders of Class 6 General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, Holders of Class 6 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

g.      *Class 7 — Equity Interests in Sbarro Holdings, LLC*

   i.      *Classification*: Class 7 consists of all Equity Interests in Sbarro Holdings, LLC.

   ii.     *Treatment*:   Holders of Equity Interests in Sbarro Holdings, LLC shall not receive any distribution on account of such Equity Interests in Sbarro Holdings, LLC.  On the Effective Date, all Sbarro Holdings, LLC Equity Interests shall be discharged, cancelled, released, and extinguished.

   iii.    *Voting*:   Class 7 is Impaired and Holders of Class 7 Equity Interests in Sbarro Holdings, LLC are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code.   Therefore, Holders of Equity Interests in Sbarro Holdings, LLC are not entitled to vote to accept or reject the Plan.

h.      *Class 8 — Intercompany Interests*

   i.      *Classification*: Class 8 consists of all Intercompany Interests.

   ii.     *Treatment*:  Holders of Intercompany Interests shall be reinstated and the legal, equitable and contractual rights to which holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

   iii.    *Voting*:  Class 8 is Unimpaired and Holders of Class 8 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

## 3.      Intercompany Claims

Notwithstanding anything herein or in the Plan to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Debtors or the Reorganized Debtors, all Intercompany Claims will be: (i) preserved and reinstated, in full or in part; (ii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (iii) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; or (iv) contributed to the capital of the obligation entity.

K&E 19518290

4. **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

5. **Acceptance or Rejection of the Plan**

    *a.*    *Presumed Acceptance of Plan*

Holders of Claims in Classes 1, 2, and 8 are Unimpaired under the Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

    *b.*    *Voting Classes*

Each Holder of an Allowed Claim in Classes 3 and 5 shall be entitled to vote to accept or reject the Plan.

    *c.*    *Deemed Rejection of the Plan*

Holders of Claims in Classes 4, 6, and 7 and Holders of Equity Interests in Class 8 are Impaired and shall receive no distributions under the Plan on account of their Claims or Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 4, 6, and 7 and Holders of Equity Interests in Class 8 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.

    *d.*    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class thereof, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

6. **Nonconsensual Confirmation**

Except as otherwise specifically provided in the Plan, if an Impaired Class shall not accept the Plan by the requisite statutory majority provided in sections 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

7. **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal or equitable subordination rights relating thereto.

8. **Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### C.    MEANS FOR IMPLEMENTATION OF THE PLAN

#### 1.    General Settlement of Claims

As provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

#### 2.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate.

#### 3.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.  On the Effective Date, Reorganized Holdings shall file a certificate of conversion to corporation and the Certificate of Incorporation with the office of the Secretary of State of Delaware and shall thereby be converted into a Delaware corporation, governed by the Certificate of Incorporation and Bylaws.

#### 4.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

#### 5.    Indemnification Provisions in Organizational Documents

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees, or agents who were employed as directors, officers, employees, or agents of such Debtor, on or after the Petition Date at least to the same extent as the bylaws of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws

before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees', or agents' rights. Notwithstanding anything contained in this Plan, the Reorganized Debtors may in their sole discretion (but have no obligation to) honor each Indemnification Obligation to a director, officer or employee that was no longer employed by the Debtors in such capacity on or after the Petition Date provided that, for each such director, officer or employee, the Debtors shall be permitted to honor Indemnification Obligations only to the extent of available coverage under the applicable D&O Liability Insurance Policy.

6.  **Cancellation of Agreements, Senior Notes and Equity Interests**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents, the Senior Notes Indenture, and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

(a)   the DIP Facility shall continue in effect solely for the purpose of: (a) allowing Holders of the DIP Facility Claims to receive the distributions provided for hereunder and (b) allowing the DIP Agent to receive distributions from the Debtors and to make further distributions to the Holders of the DIP Facility Claims on account of such Claims, as set forth in Article VI of the Plan; (c) preserving the DIP Agent's right to indemnification from the Debtors pursuant and subject to the terms of the DIP Facility in respect of any claim or cause of action asserted against the DIP Agent;

(b)   the Prepetition First Lien Loan Documents shall continue in effect solely for the purpose of: (a) allowing Holders of the Prepetition First Lien Lender Claims to receive the distributions provided for hereunder and (b) allowing the Prepetition First Lien Agent to receive distributions from the Debtors and to make further distributions to the Holders of the Prepetition First Lien Lender Claims on account of such Claims, as set forth in Article VI of the Plan; and (c) preserving the Prepetition First Lien Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition First Lien Loan Documents in respect of any claim or cause of action asserted against the Prepetition First Lien Agent; and

(c)   the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; and provided, further, however, that, at the election of the Prepetition First Lien Steering Committee, the Prepetition First Lien Credit Facility may remain in effect and be amended and restated consistent with the Exit Term Loan Facility.

7.  **Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand, including cash from operations and the proceeds of the New Money Exit Facility. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set

forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

## 8.    Exit Financing and Approval of Exit Credit Documents

On the Effective Date, the Reorganized Debtors will have total funded debt of $[●] million, in the form of the Exit Term Loan Facility and amounts funded under the New Money Exit Facility, which will result in at least $10 million of cash on the balance sheet of the Reorganized Debtors. The Reorganized Debtors may use the Exit Financing for any purpose permitted by the governing documents, including the funding of obligations under the Plan, satisfaction of ongoing working capital needs, and to cash collateralize existing or replacement letters of credit.

Confirmation of the Plan shall be deemed approval of the Exit Financing (including the Exit Term Loan Facility and the New Money Exit Facility and all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Financing, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Credit Documents and such other documents as may be required or appropriate.

The Exit Credit Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Credit Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Credit Documents (1) shall be deemed to be approved, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Documents, (3) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Credit Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Exit Credit Documents that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests, in each case all costs and expenses in connection therewith to be paid by the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Documents or any rights or remedies related thereto.

## 9.  Reorganized Debtors' Equity Interests

### a.  New Common Stock

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Stock.  The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition First Lien Lender Claims, subject to dilution by equity issued in connection with the Management Equity Plan.  From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of Reorganized Holdings, Reorganized Holdings shall have one class and one series of New Common Stock.  The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved on account of Reserved Employee Equity and/or shares issued in connection with the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution.  Distributions of New Common Stock to the Prepetition First Lien Lenders will only be made through broker accounts via electronic issuance of the Shares and Reorganized Holdings will not issue separate stock certificates.

### b.  Shareholders Agreement

On the Effective Date, Reorganized Holdings and the holders of the New Common Stock shall enter into the Shareholders Agreement, in substantially the form included in the Plan Supplement.  The Shareholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

## 10.  Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution or sale of securities.  In addition, except as otherwise provided in the Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Common Stock contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

## 11.  Organizational Documents

Subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Certificate of Incorporation and the Bylaws.  From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code to the extent required by section 1123(a)(6) of the Bankruptcy Code.

## 12.  Effectuating Documents; Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors,

without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors, managers, partners, or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers, partners, or members of the Debtors, or the need for any approvals, authorizations, actions, or consents.

## 13. Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 14. Directors and Officers of Reorganized Holdings and the Other Reorganized Debtors

### a. The New Board

The New Board shall consist of five directors selected by the Prepetition First Lien Steering Committee in consultation with the Debtors and subject to background checks reasonably satisfactory to the Debtors. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing. The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

### b. Senior Management

Prior to the Confirmation Hearing, the Debtors will have engaged a search firm acceptable to the Prepetition First Lien Steering Committee to conduct a process for selection of the Reorganized Debtors' chief executive officer. The Debtors' interim chief executive officer as of the Petition Date shall be considered as a candidate without deference to his incumbency.

The existing officers of the Debtors as of the Petition Date (including the Debtors' interim chief executive officer unless and until a replacement chief executive officer is selected) shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements. The Debtors' existing senior management is comprised of the following individuals:

K&E 19518290

| Name | Title | Relevant Experience |
| --- | --- | --- |
| Nicholas McGrane | President and Chief Executive Officer | Prior to joining Sbarro, Mr. McGrane served as a partner of a private equity firm. Before that, Mr. McGrane was a Vice President at DB Capital Partners. Prior to joining DB Capital Partners' predecessor BT Capital Partners in 1997, Mr. McGrane was a Director of Business Development at Imax Corporation, the large screen entertainment company. Mr. McGrane also has experience as a consultant at Bain & Company and a financial analyst at Kidder, Peabody & Co., Inc. |
| Anthony J. Missano | President, Business Development and Corporate Vice President | Mr. Missano joined Sbarro, Inc in 1975. He served as President of the Quick Service Division from January 2000 to February 2004. |
| Carolyn M. Spatafora | Chief Financial Officer | Ms. Spatafora previously served as Senior Vice President of Finance. Ms. Spatafora joined Sbarro, Inc. in March 2005 as Director of Finance and Controller. Prior to joining Sbarro, Inc. Ms. Spatafora was employed by Adecco, a staffing services company, for ten years as a Director and Assistant Vice President in positions of Internal Audit and Information Technology. Ms. Spatafora also spent five years at KPMG as a Certified Public Accountant. |
| Mark Censoprano | Chief Marketing Officer | Mr. Censoprano previously served as Senior Vice President of Culinary and Beverage for Darden Restaurants, Vice President of Brand Management for Olive Garden and as a Director of the Campbell Soup Company. Mr. Censoprano also had management experience at S.C. Johnson & Son. |

### 15. Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

K&E 19518290

Subject to the releases set forth in Article IX of the Plan, the Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

### D. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed assumed as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (a) identified on the Rejected Executory Contract/Unexpired Lease List (which shall be filed with the Bankruptcy Court on the Contract/Lease Schedule Date) as an Executory Contract or Unexpired Lease designated for rejection, or (b) which is the subject of a separate motion or notice to reject filed by the Debtors and pending as of the Confirmation Hearing.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Executory Contracts and Unexpired Leases identified on the Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List in their discretion prior to the Effective Date on no less than seven days' notice to the non-debtor Entity party thereto.

#### 2. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days prior to the Voting Deadline, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors prior to the Confirmation Hearing (or such other date as may be provided in the applicable assumption notice). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

### 3. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be treated as General Unsecured Claims.

### 4. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 5. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 6. Assumption of Directors and Officers Insurance Policies

The Debtors do not believe that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such

capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

### 7. Indemnification and Reimbursement Obligations

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth herein, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the directors, officers, managers, employees, attorneys, other professionals and agents employed by the Debtors in such capacity on or after the Petition Date to the extent set forth herein. Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those arising from or related in any way to: (1) any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment); (2) any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor; (3) any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors; (4) any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and (5) any action taken or not taken in connection with the Chapter 11 Cases or the Plan. In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof. Notwithstanding anything contained in this Plan, the Reorganized Debtors may in their sole discretion (but have no obligation to) honor each Indemnification Obligation to a director, officer or employee that was no longer employed by the Debtors in such capacity on or after the Petition Date provided that, for each such director, officer or employee, the Debtors shall be permitted to honor Indemnification Obligations only to the extent of available coverage under the applicable D&O Liability Insurance Policy.

### 8. Employee Compensation and Benefits

#### a. Compensation and Benefit Programs

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

i. all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Equity Interests in Sbarro, Inc.;

ii. Compensation and Benefits Programs listed in the Plan Supplement as executory contracts to be rejected;

iii. Compensation and Benefits Programs that have previously been rejected; and

iv.    Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption contemplated by the Plan in which case any such Compensation and Benefits Program shall be deemed rejected as of immediately prior to the Petition Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

b.    *Workers' Compensation Programs*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided further that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

c.    *Management Compensation Plan*

Subject only to the occurrence of the Effective Date, the Management Compensation Plan shall become effective without any further action by the Reorganized Debtors.

d.    *Management Equity Plan*

As soon as practicable following the Effective Date, the New Board will adopt and implement the Management Equity Plan, pursuant to which retentive and performance-based equity awards (in the form to be determined by the New Board) of no less than 1/2 of the Reserved Employee Equity shall be allocated to certain key employees of the Reorganized Debtors and members of the New Board, a portion of which may be reserved by the New Board for allocation to the Reorganized Debtors' chief executive officer if the selection process for such chief executive officer has not then been completed.[6]

## E.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    Distribution on Account of Claims and Interests Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Initial Distribution Date; provided, however, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) in accordance with Article II.C herein, Allowed Priority Tax Claims, unless otherwise agreed, shall receive (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by

---

[6]    The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Prepetition First Lien Steering Committee and the Debtors and are subject to change.

section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (b) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court; or (c) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 2. Distributions on Account of Claims and Interests Allowed After the Effective Date

#### a. Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article IX.A of the Plan, on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

#### b. Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

### 3. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably practicable after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. Distributions on account of General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date, or as soon as practicable thereafter.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 4. Delivery of Distributions

#### a. Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded security is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

K&E 19518290

### b. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

### c. Delivery of Distributions to Prepetition First Lien Lender Claims

The Prepetition First Lien Agent shall be deemed to be the holder of all Prepetition First Lien Lender Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition First Lien Lender Claims shall be made to or on behalf of the Prepetition First Lien Agent. The Prepetition First Lien Agent shall hold or direct such distributions for the benefit of the holders of Allowed Prepetition First Lien Lender Claims, as applicable. As soon as practicable following compliance with the requirements set forth in Article VII of the Plan, the Prepetition First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of such holders of Allowed Prepetition First Lien Lender Claims. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition First Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Agent.

### d. Distributions by Distribution Agents (if any)

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

### e. Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Stock under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock (up or down), with half dollars and half shares of New Common Stock or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made from on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VI.D.6 of the Plan.

*f.*     *Undeliverable Distributions*

i.     Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VI.6(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

ii.     Failure to Claim Undeliverable Distributions

No later than 120 days after the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.

In such cases any Cash or New Common Stock held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

iii.     Failure to Present Checks

Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for distribution on account of such Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Period Distribution Date, free of any Claims of such Holder with respect thereto, subject to the provisions of Articke VI.D.5 of the Plan. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

5. **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6. **Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, Equity Interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

7. **Surrender of Canceled Instruments or Securities**

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

8. **Claims Paid or Payable by Third Parties.**

        *a.*      *Claims Paid by Third Parties*

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total

recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

If the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### b.    Claims Payable by Insurance

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## F.    PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

### 1.    Allowance of Claims and Interests

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

### 2.    Prosecution of Objections to Claims

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the sole authority: (1) to file, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

### 3.    Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party

previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### 4. Adjustment to Claims and Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Disallowance of Claims or Interests

Except for any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED IN THE PLAN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER**.

### 6. Offer of Judgment

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7. Amendments to Claims

On or after the Effective Date, except as provided in the Plan, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior

authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## G.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1.  Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.  The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Prepetition First Lien Steering Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.  The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance reasonably acceptable to the Debtors and the Prepetition First Lien Steering Committee.

3.  The Confirmation Order shall have been entered and become a Final Order in form and in substance reasonably satisfactory to the Debtors and the Prepetition First Lien Steering Committee.

4.  All documents and agreements necessary to implement the Plan, including, without limitation, the Exit Credit Documents shall have (a) been tendered for delivery and (b) been effected or executed. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5.  The Management Compensation Plan shall be in form and in substance reasonably satisfactory to the Debtors and the Prepetition First Lien Steering Committee.

6.  The Reorganized Debtors shall have a minimum of $10 million of unrestricted Cash after giving effect to cash distributions made pursuant to the Plan and funds received from the initial draw of the New Money Exit Facility.

7.  All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

8.  The Professional Fee Escrow Account shall have been established and funded.

### 2.  Waiver of Conditions

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Prepetition First Lien Steering Committee, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, or the Prepetition First Lien Steering Committee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

### 3.  Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall:  (1) constitute a waiver or release of any Cause of Action or Claim; (2) constitute an admission,

acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

## H.    RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.    Discharge of Claims and Termination of Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 2.    Releases by the Debtors

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE EXIT CREDIT DOCUMENTS OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A

CRIMINAL ACT TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT.

THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY THE PLAN.

3.    Releases by Holders of Claims and Equity Interests

AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE EXIT CREDIT DOCUMENTS OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE THE PERSONAL LIABILITY OF ANY OF THE AFOREMENTIONED RELEASED PARTIES IN ARTICLE IX OF THE PLAN FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTIES FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS.

4.    Exculpation

UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS WILL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE , INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

K&E 19518290

**EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; <u>PROVIDED</u> THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; <u>PROVIDED FURTHER</u> THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.**

5.      **Injunction**

**THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO ARTICLE X OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY PERSON BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR  PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.**

6.      **Setoffs**

Except as otherwise provided in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u> that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

7.      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

# I.     RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.     Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

K&E 19518290

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. Enter an order or final decree concluding or closing the Chapter 11 Cases;

17. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Term Loan Facility, which such disputes shall be adjudicated in accordance with the terms of the Exit Term Loan Facility);

21. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23. Enforce all orders previously entered by the Bankruptcy Court; and

24. Hear any other matter not inconsistent with the Bankruptcy Code.

## J.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

### 1.    Modification of Plan

Subject to the limitations contained in the Plan:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

K&E 19518290

### 3. Revocation of Plan

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity

## K. MISCELLANEOUS PROVISIONS

### 1. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 2. Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3. Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### 4. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 5. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

6. **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

- Counsel to the Debtors: Kirkland & Ellis LLP, Attn: Edward O. Sassower and Nicole L. Greenblatt, 601 Lexington Avenue, New York, New York 10022;

- Special Counsel to the Debtors: Curtis, Mallet-Prevost, Colt & Mosle LLP, Attn: Steven J. Reisman, 101 Park Avenue, New York, New York 10178;

- Counsel to the Agent for the Prepetition First Lien Lenders and DIP Lenders: Davis Polk & Wardwell LLP, Attn: Timothy Graulich and Steven Krause, 450 Lexington Avenue, New York, New York 10017;

- Counsel to the Prepetition Second Lien Lenders: Quinn Emanuel Urquhart & Sullivan, LLP, Attn: Susheel Kirpalani and Daniel Holzman, 51 Madison Avenue, 22nd Floor, New York, New York 10010;

- Counsel to the Creditors' Committee: Otterbourg, Steindler, Houston & Rosen, P.C., Attn: Scott L. Hazan and David M. Posner, 230 Park Avenue, New York, New York 10169.

- Indenture Trustee for the Senior Notes: The Bank of New York, Attn: Corporate Trust Division, Corporate Finance Unit, 101 Barclay Street, SW, New York, New York, 10286;

- Counsel to the Ad Hoc Group of Certain Holders of the Senior Notes: Sullivan & Cromwell LLP, Attn: Andrew G. Dietderich, 125 Broad Street, New York, New York, 10004; and

- United States Trustee: Office of the United States Trustee for the Southern District of New York, Attn: Elisabetta Gasparini and Paul K. Schwartzberg, Whitehall Street, 21st Floor, New York, New York 10004.

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

7. **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation

Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

8.      **Entire Agreement**

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

9.      **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; <u>provided</u> that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

10.     **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date or the Solicitation Date, as applicable.  After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://dm.epiq11.com/sbarro or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

11.     **Nonseverability of Plan Provisions upon Confirmation**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

12.     **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

13.     **Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits,

K&E 19518290

appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control

### 14. Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that after the Effective Date and the conclusion of any appeals or other challenges or matters with respect to entry of the Confirmation Order, the Creditors' Committee's functions shall be restricted to, and the Creditors' Committee shall not be heard on any issue except, obtaining a Final Order of the Bankruptcy Court authorizing or approving Accrued Professional Compensation of its Retained Professionals or the representation of the Creditors' Committee in connection with the review of and the right to be heard in connection with all Professional Fee Claims. Following the Confirmation Date, in accordance with the foregoing, the attorneys and financial advisors to the Creditors' Committee shall be entitled to assert any reasonable claims for compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in connection with services to the Creditors' Committee.

### 15. Section 1125(e) Good Faith Compliance

The Debtors, Reorganized Debtors, the Prepetition First Lien Agent, the DIP Agent, the Creditors' Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 16. Further Assurances

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 17. No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

K&E 19518290

# V.    VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## A.    VALUATION OF THE REORGANIZED DEBTORS

The Debtors, with the assistance of Rothschild, have pursued an extensive marketing process for substantially all of the Debtors' assets.  Over the course of a nine-month process, the Debtors contacted approximately 109 potential investors and plan sponsors. A detailed description of the marketing process is set forth in Article III.D of this Disclosure Statement.  After evaluating all available restructuring alternatives and negotiating at arm's length with key stakeholders, the Debtors have reached an agreement with the Prepetition First Lien Steering Committee for the transaction reflected in the Plan and described herein.

Rothschild believes the recoveries provided by the terms of the Plan reflect a reasonable measure of the Debtors' value in light of, among other things, the comprehensive nature of the marketing process.  Moreover, as noted above, simultaneously with the filing of the Plan, the Debtors have sought approval of certain bid procedures that contemplate an auction and Overbid Process that will further test the market for the Debtors' assets.  Accordingly, the Debtors may receive a proposal containing higher and better recoveries through the Overbid Process.

## B.    FINANCIAL PROJECTIONS

As further discussed in Article VI.A.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of Financial Projections for the years 2011 through 2015 as attached hereto as **Exhibit C**, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. In general, as illustrated by the Financial Projections, the Debtors believe that the Reorganized Debtors will be viable.  The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.  Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon**

K&E 19518290

as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.

## VI. CONFIRMATION PROCEDURES

### A. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any

fraction thereof), to the Office of the United States Trustee, until the case is converted or dismissed, whichever occurs first.

### 1. Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

As described in more detail in the Debtors' Liquidation Analysis attached hereto as **Exhibit D**, the Debtors believe that Confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtors, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses, and have developed a business plan and prepared the Financial Projections.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. Under the Plan, the Debtors' balance sheet will become materially deleveraged. In addition, the Debtors have secured commitments for Exit Financing that will ensure sufficient liquidity to fund payments required by the Plan and the Debtors' ongoing operational needs. Accordingly, as illustrated by the Financial Projections, the Debtors believe that, with a significantly de-leveraged capital structure and reduced interest expense, the Reorganized Debtors should have sufficient cash flow and availability to pay and service their debt obligations, fund operations and improve profitability over the five-year business plan horizon. The Debtors believe that Confirmation and consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires as a condition to confirmation that, except as described in Article VII.B.5 below, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 2 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

The Claims in Classes 4, 6 and 7 are Impaired under the Plan and will receive no distributions under the Plan and, therefore, are deemed to have rejected the Plan.

The Claims in Classes 3 and 5 are Impaired under the Plan and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### a. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. Accordingly, a plan could treat two Classes of unsecured creditors differently without unfairly discriminating against either Class.

K&E 19518290

b.      *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests*:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 4, 6 and 7.  The Debtors believe that the Plan may be confirmed on a nonconsensual basis (provided that at least one impaired Class of Claims votes to accept the Plan).  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to (i) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (ii) alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The votes of Holders of Classes 4, 6 and 7 are not being solicited because, under Article III of the Plan, there will be no distribution to such Holders. The members of Classes  4, 6 and 7 have, therefore, conclusively been deemed to have rejected the Plan pursuant to section 1129(b) of the Bankruptcy Code. All Class 4, 6 and 7 Claims will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Classes 4, 6 and 7 or any Class that votes to reject the Plan, the Debtors believe that the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## B.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.      Liquidation Under Chapter 7

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the

effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit D**.

### 2. Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization, which might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. The Debtors have explored various alternatives to the Plan before and during these Chapter 11 Cases and believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances (and subject to the Overbid Process). In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors. In any liquidation, creditors would be paid their distribution (if any) in Cash, whereas under the Plan, some creditors will receive part of their distribution in New Common Stock.

## C. CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan could contact legal counsel to the Debtors, by: (a) writing to Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attention: Sbarro; or (b) calling Paul Wierbicki at (312) 862-2000.

## VII. PLAN-RELATED RISK FACTORS

> **PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

## A. GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims and Equity Interests that are Impaired should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in Sbarro's Annual Report or Form 10-K for the fiscal year ended December 31, 2009, and Quarterly Report on Form 10-Q for the quarterly period ended September 26, 2010, the entirety of which are publicly available at (a) the Debtors' investor relations website, located at http://www.sbarro.com and (b) the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, located at http://www.sec.gov/edgar.shtml.

## B. CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1. Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## 2. Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

## 3. Debtors May Not Be Able to Secure Confirmation or Consummation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article VIII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

## 4. Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

## 5. Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

K&E 19518290

6.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.      **Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Debtors are consolidated and whether or not the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C.      RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN

1.      **Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes**

No less than three unknown factors make certainty in creditor recoveries impossible.  The Debtors cannot know with any certainty, at this time, (a) the value of distributions to be made in New Common Stock, (b) the number or amount of Claims in Voting Classes that will ultimately be Allowed, or (c) the number or size of Claims senior to the Claims in the Voting Classes or unclassified Claims that will ultimately be Allowed.

In addition, pursuant to the overbid process set forth in the Bidding Procedures Order and summarized in Article I.B herein, recoveries to some or all Classes may change if the Debtors select an alternative restructuring proposal as the winning bid at an auction.  **Every Holder of a Claim or Interest against the Debtors will receive at least as much value from any winning auction bid as under the Plan.**

2.      **Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect Percentage Recoveries**

Any Claims estimates set forth herein are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect.  Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.  Additionally, the Debtors have made certain assumptions, as described in Article III.F, **which should be read carefully**.

3.      **A Liquid Trading Market for the New Common Stock May Not Develop**

A liquid trading market for the New Common Stock is unlikely to develop. As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system and the Reorganized Debtors will not file any reports with the SEC.  Consequently, the trading liquidity of the New Common Stock will be limited as of the Effective Date. The future liquidity of the trading market for New Common Stock will depend, among other things, upon the number of holders of such securities, whether such securities become listed for trading on an exchange or trading system at some future time and whether the Reorganized Debtors begin to file annual and quarterly reports with the SEC.

4.      **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures**

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the

Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current product offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the equity interests of the holders of the then-existing New Common Stock could be diluted. While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

5.      **Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Private Sale Values of the New Common Stock**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

6.      **Small Number of Holders or Voting Blocks May Control the Reorganized Debtors**

Consummation of the Plan is likely to result in a small number of holders owning a significant percentage of the shares of outstanding New Common Stock. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, other material corporate transactions or the sale of all or substantially all of the assets of the Reorganized Debtors.

7.      **Issuance of Equity Interests to Debtors' Management Will Dilute the New Common Stock**

After the Effective Date, the New Board will establish and implement the Management Equity Plan whereby equity awards of no less than half of the Reserved Employee Equity shall be allocated to certain key employees of the Reorganized Debtors and members of the New Board. If the New Board distributes such equity interests to management or employees pursuant to the Management Equity Plan, it is contemplated that such distributions will dilute the New Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

8.      **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors**

Holders of Allowed Claims should carefully review Article IX herein, *Certain United States Federal Income Tax Consequences*, to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

9. **Impact of Interest Rates**

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

## D. RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS

1. **The Debtors filed voluntary petitions for relief under Chapter 11 in the Bankruptcy Court and are subject to the risks and uncertainties associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- the Debtors' ability to comply with and operate under the terms of the DIP Facility and any cash management orders entered by the Bankruptcy Court from time to time;

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate a Plan to emerge from bankruptcy;

- the Debtors' ability to obtain and maintain normal trade terms with suppliers and service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate and retain key employees;

- the Debtors' ability to attract and retain customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' sales and relationships with their customers, as well as their suppliers and employees, which in turn could adversely affect the Debtors' operations, financial condition, and assets. Also, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors-in-possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in the Form 10-Q for the quarter ended September 26, 2010 that the Debtors filed on November 10, 2010. Further, a Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of confirmation of a Plan.

2. **The DIP Facility and Exit Credit Documents include financial and other covenants that impose substantial restrictions on the Debtors' financial and business operations**

The DIP Facility includes certain restrictions and conditions to extension, including requiring the Debtors to maintain a minimum level of liquidity. If the Debtors are unable to meet the liquidity test required for extension of the DIP Maturity Date, they may default on the DIP Facility or be unable to extend the Maturity Date.

Furthermore, the DIP Facility contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Facility and are unable to obtain a waiver or amendment of the DIP Facility, an event of default will occur thereunder. The DIP Facility contains other events of defaults customary for debtor-in-possession financings.

The Exit Credit Documents will likely include various restrictive covenants, financial covenants and tests that could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs, or otherwise restrict the Reorganized Debtors' financing and operations and could require the Debtors to periodically meet various financial tests. If the Reorganized Debtors fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from their lenders to maintain compliance under their Exit Financing agreements, which, if not obtained, would have a material adverse effect on the Reorganized Debtors' financial condition and future operating performance.

3. **The Debtors' emergence from bankruptcy may potentially reduce or eliminate their tax attributes**

As of January 2, 2011, it is estimated the Company had an aggregate amount of net operating losses of approximately $65 million and tax credit carryforwards of approximately $3 million (collectively, the "***Tax Attributes***"). In connection with the Debtors' emergence from Chapter 11, it is likely that the Tax Attributes will be significantly reduced (and possibly eliminated altogether) due to the cancellation of indebtedness income, with any remaining Tax Attributes subject to limitation under Internal Revenue Code sections 382 and 383. In addition, it is possible that Sbarro's tax basis in its assets will also be reduced de to cancellation of indebtedness income. A full valuation allowance has been recorded against the deferred tax assets related to these Tax Attributes in the condensed consolidated balance sheets for the period ended January 2, 2011.

4. **Deterioration in general economic conditions and declines in consumer spending can negatively affect the Debtors' business**

The Debtors' business is susceptible to adverse changes in domestic and global economic conditions, which could make it difficult and uncertain for them to forecast operating results. In particular, the Debtors' business is sensitive to consumer spending patterns and preferences. Market and general economic conditions including general business conditions, interest rates, taxation, the availability of consumer credit and consumer confidence in future economic conditions affect the level of discretionary spending on the products the Debtors and their franchisees offer. Any unfavorable occurrences in these economic conditions may adversely affect the Debtors' growth, sales and profitability. For instance, many of the Debtors' company-owned stores and their franchisees' stores are located in shopping malls, particularly in the United States. The Debtors' stores derive revenue, in part, from the high volume of traffic in these malls. As a result of deteriorating economic conditions, the inability of mall "anchor" tenants and other area attractions to generate consumer traffic around the Debtors' stores or the decline in popularity of malls as shopping destinations could reduce revenue. Additionally, continuing weakness in the residential real estate and mortgage markets, volatility in commodity and fuel costs, difficulties in the financial sector and credit markets, and other factors affecting consumer spending could cause reduced sales of the Debtors' products and make it more difficult for the Debtors' to execute their growth strategy.

5. **The success of the Debtors' growth strategy will depend, in part, upon their ability to expand their franchise operations.**

The success of the Debtors' franchise operations is dependent upon the Debtors' ability to:

- locate and attract new franchisees and area developers;

- maintain and enhance the "Sbarro" brand;

- maintain satisfactory relations with the Debtors' franchisees who may, in certain instances, have interests adverse to the Debtors' interests;

- monitor and audit the reports and payments received from franchisees; and

- comply with applicable rules and regulations, as well as applicable laws in the foreign countries in which the Debtors' seek and have, franchises and area development arrangements.

With respect to foreign franchisees, the Debtors' are also at risk with respect to

- restrictions that may be imposed upon the transfer of funds from those countries;

- the political and economic stability of the country; and

- the country's relationship with the United States.

**6.      Credit market effect on the Debtors' franchise operations**

Credit markets may adversely impact the ability of the Debtors' franchisees to obtain financing to remodel or construct and open new restaurants, which may hinder the Debtors' ability to achieve their franchise revenues and growth strategy.  The credit markets continue to experience instability, resulting in declining real estate values, credit and liquidity concerns and increased loan default rates.  Many lenders have subsequently reduced their willingness to make new loans and have tightened their credit requirements.

**7.      The Debtors operate in a highly competitive environment against strong competition**

The restaurant business is highly competitive.  The Debtors believe that they compete on the basis of price, service, location and food quality.  There is also active competition for management personnel and attractive shopping mall, downtown and other commercial locations suitable for restaurants.  The Debtors compete in each market in which they operate with locally-owned restaurants, and in certain cases, national and regional restaurant chains.

Although the Debtors believe they are well positioned to compete because of their leading market position, focus and expertise in the quick-service Italian specialty food business and strong national brand name recognition, the Debtors could experience increased competition from existing or new companies and lose market share that, in turn, could have a material adverse effect on the Debtors' business, financial condition, results of operations, prospects and ability to service their debt obligations.

**8.      The availability, quality and cost of the Debtors' ingredients fluctuate, which affects their financial results**

Significant increases in food and paper product costs, which the Debtors may not be able to pass on to their customers, could affect the Debtors' financial results.  Many of the factors in determining food and paper product prices, such as increases in the prices of the ingredients the Debtors use to prepare their foods, especially cheese and flour, and inflation are beyond the Debtors' control.  Furthermore, adverse weather and other conditions can cause shortages and interruptions in, and also could adversely affect the availability, quality and cost of, the ingredients the Debtors use to prepare their foods.  These events could adversely affect the Debtors' financial and operational results because the Debtors need to provide their customers with fresh products.

9. **Increases in labor and occupancy costs could impact the Debtors' profitability**

The Debtors have a substantial number of hourly employees whose wages are based on the federal or state minimum wage. Any increases in the federal or state minimum wage, as well as strong labor markets, can result in upward pressures on the wages and salaries the Debtors pay and could increase their labor costs. In addition, the Debtors have been experiencing higher occupancy related costs with respect to leases for new restaurants and renewal leases for existing restaurant space. Increases in the Debtors' labor and occupancy costs could adversely affect their profitability if they are unable to recover these increases by increasing the prices they charge their customers or if they are unable to attract new customers.

10. **The Debtors rely on one national independent wholesale distributor and replacing it could disrupt the flow of the Debtors' food products and supplies**

The Debtors use one national independent wholesale food distributor, under an agreement expiring in 2013, to purchase and deliver most of the food ingredients used to prepare the foods the Debtors serve, other than breads, pastries, produce, fresh dairy and certain meat products which are purchased locally for each restaurant. The distributor also purchases and delivers to the Debtors, on a national basis, restaurant supplies and certain other items that the Debtors use. The majority of spending on the products used in the Debtors' restaurants is for proprietary products and the Debtors are involved in negotiating their cost with the manufacturers. While the Debtors are dependent upon this one national independent distributor, the Debtors believe that there are other distributors who would be able to service the Debtors' needs. However, there can be no assurance that the Debtors will be able to replace their distributor with others on comparable terms or without disruptions to the flow of their food products and other supplies to their systems.

11. **The Debtors depend on their senior management and other key employees**

The Debtors' success is dependent upon their senior management team. The Debtors' continued success is dependent upon their ability to attract and retain key employees. As a privately-held company, the Debtors may be unable to offer key executives liquid stock-based compensation of the type that the Debtors' publicly-held competitors can offer. There is no assurance that the Debtors will be able to retain their existing senior management or attract other key employees. The Debtors have employment agreements with several members of their senior management.

12. **The Debtors' results of operations fluctuate due to the seasonality of their business**

The Debtors' revenues and earnings are highest in their fourth fiscal quarter primarily due to increased volume in shopping malls during the holiday shopping season. As a result, the Debtors' annual revenues and earnings are substantially dependent upon the amount of traffic in shopping malls during the holiday shopping period. Changes in the level of traffic in shopping malls during this period have a disproportionate effect on our annual results of operations. A weak holiday shopping season, which could be caused by, among other factors, a downturn in the economy, an expansion of on-line shopping or adverse weather conditions, could adversely affect the Debtors' profitability.

E. **RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

1. **Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed**

<u>**The financial information contained in this Disclosure Statement has not been audited**</u>. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2. **Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Such projections are not to bee viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Reorganized Debtors, and no assurance can be given that any particular projections will be realized. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections and such differences may be material. The Financial Projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the potential adverse impacts of the filing of the Chapter 11 Cases on the Debtors' business, financial condition or results of operations, including the Debtors' ability to maintain contracts, trade credit and other customer and vendor relationships that are critical to their business and the actions and decisions of their creditors and other third parties with interests in the Chapter 11 proceedings; (b) the Debtors' ability to obtain approval of Bankruptcy Court with respect to motions in the Chapter 11 proceedings prosecuted from time to time and to develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the Chapter 11 proceedings and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned; (c) the timing of confirmation and consummation of one or more plans of reorganization in accordance with its terms; (d) the anticipated future performance of Reorganized Sbarro, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (e) general economic conditions in the markets in which the Debtors operate, including changes in interest rates or currency exchange rates; (f) the financial condition of the Debtors' customers or suppliers; (g) changes in actual consumer demand from the Debtors' current estimates; (h) disruptions in the relationships with the Debtors' suppliers; (i) labor disputes involving the Debtors or their significant customers or suppliers or that otherwise affect the Debtors; (j) the costs, timing and success of restructuring actions; (k) competitive conditions impacting the Debtors' customers and suppliers; (l) the cost and availability of raw materials and energy; (l) the outcome of legal or regulatory proceedings to which the Debtors are or may become parties; (m) unanticipated changes in cash flow; and (n) other risks described from time to time in Sbarro's SEC filings. Future operating results will be based on various factors, including consumer demand, cost of goods and services, and the Debtors' success in implementing their operating strategy.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized, nor can there by any assurance that recent performance trends will continue.

F.  **DISCLOSURE STATEMENT DISCLAIMER**

1.  **Information Contained Herein Is for Soliciting Votes and Exercising Subscription Rights**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.  **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this

Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of New Common Stock to Holders of certain Classes of Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Stock (including the shares reserved for issuance under the Management Equity Plan) will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act or Regulation D promulgated thereunder, Rule 701 of the Securities Act or a "no sale" under the Securities Act as described herein.

### 4. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 5. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.

### 7. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

### 8. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to

object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

### 9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the United States Trustee.

## VIII.  IMPORTANT SECURITIES LAW DISCLOSURE

Under the Plan, Securities (including shares of New Common Stock) may be distributed to Holders of Claims in Class 3. The Reorganized Debtors and the Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the Plan Securities and any New Common Stock issued pursuant to the terms thereof. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for Cash.

In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive the Plan Securities are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

*You should confer with your own legal advisors to help determine whether or not you are an "underwriter."*

Under certain circumstances, Holders of New Common Stock deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.

## IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the U.S. Treasury Regulations promulgated thereunder (the "***Regulations***"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "***IRS***"), all as in effect on the date hereof. Changes in such rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code). This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock or Exit Term Loan Facility as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS**

1.    **Consequences to Holders of Allowed Claims in Classes 1, 2 and 5**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, Holders of Allowed Class 1 Other Priority Claims and Class 5 Unsecured Ongoing Operations Claims will be exchanged for Cash. Holders of Allowed Class 2 Other Secured Claims will (i) be exchanged for Cash, (ii) be exchanged for the collateral securing such Claims or (iii) have their Claims rendered unimpaired. A Holder who receives Cash or collateral in exchange for its Claim pursuant to the Plan generally will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash (or the value of any collateral) received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

In the event the Debtors select a "topping" bid that differs from the proposed Plan, the Holders of Allowed Class 1 Other Priority Claims, Class 2 Other Secured Claims and Class 5 Unsecured Ongoing Operations Claims may be exchanged for Cash, to the extent Cash is available for payment to such Holders pursuant to the absolute priority rule. In such case, the consequences to the Holders will be the same as described in the preceding paragraph.

2.    **Consequences to Holders of Allowed Claims in Class 3**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, the Holders of Allowed Class 3 Prepetition First Lien Lender Claims will be exchanged for their Pro Rata share of the Exit Term Loan Facility and the New Common Stock. The U.S. federal income tax consequences of the Plan to such Holders of Claims will depend, in part, on whether the Claims surrendered and Exit Term Loan Facility received constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. Treatment as a "security" of an instrument with an initial term between five and ten years is less clear. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The First Lien Prepetition Credit Agreement had an initial term of approximately seven years. The Exit Term Loan Facility will have an initial term of approximately five years. The Debtors expect to take the position that the Prepetition First Lien Lender Claims and the Exit Term Loan Facility are "securities." Holders of Allowed

Class 3 Claims should consult their tax advisors regarding whether such Claims and the Exit Term Loan Facility could be treated as "securities" for U.S. federal income tax purposes.

To the extent that both the Prepetition First Lien Lender Claims and the Exit Term Loan Facility are treated as "securities," then the exchange of such Allowed Claims for a Pro Rata share of the Exit Term Loan Facility and New Common Stock pursuant to the Plan should be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, a Holder should not recognize loss with respect to the exchange and should not recognize gain except to the extent that the share of the Exit Term Loan Facility and New Common Stock received are allocable to accrued but untaxed interest (see Section 4 below, "Accrued Interest"). Such Holder should obtain a tax basis in the share of the Exit Term Loan Facility and New Common Stock received equal to the tax basis of the Allowed Claims surrendered (allocated between the Exit Term Loan Facility and New Common Stock based on their relative fair market value) and should have a holding period for the share of the Exit Term Loan Facility and New Common Stock that includes the holding period for the Allowed Claims exchanged therefore, provided, however, that the tax basis of any share of the Exit Term Loan Facility and New Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of the Exit Term Loan Facility and New Common Stock (or portion thereof) should begin on the day following the Effective Date.

To the extent that the Prepetition First Lien Lender Claims are treated as securities and the Exit Term Loan Facility is not treated as a security, then the exchange of such Allowed Claims for a Pro Rata share of the New Common Stock pursuant to the Plan should still be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, a Holder should not recognize any gain or loss on the exchange, except that a Holder should recognize any gain (but not loss) on the exchange to the extent of the lesser of the amount of gain realized on the exchange (generally equal to the fair market value of all of the consideration received minus the Holder's adjusted basis, if any, in the Allowed Claims) and the fair market value (as of the date it is distributed to the Holder) of the share of the Exit Term Loan Facility. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and the extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

Such Holder should obtain a tax basis in the New Common Stock received equal to (a) the tax basis of the Allowed Claims surrendered, less (b) the fair market value of the share of the Exit Term Loan Facility received, plus (c) gain recognized (if any), and should have a holding period for the New Common Stock that includes the holding period for the Allowed Claims exchanged therefore. The tax basis of the share of the Exit Term Loan Facility should equal its fair market value (as of the date it is distributed to the Holder) and the holding period should begin on the date following the Effective Date, provided, however, that the tax basis of the share of the Exit Term Loan Facility and New Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of the Exit Term Loan Facility and New Common Stock (or portion thereof) should begin on the day following the Effective Date.

To the extent that the Prepetition First Lien Lender Claims are not treated as "securities," a Holder of such Allowed Claims should be treated as exchanging its Allowed Claims in a taxable exchange under section 1001 of the Tax Code. Accordingly, each Holder of such Allowed Claims should recognize capital gain or loss equal to the difference between: (a) the sum of (i) the issue price of the share of the Exit Term Loan Facility (which, if neither such Allowed Claims nor the Exit Term Loan Facility are "publicly traded" for U.S. federal income tax purposes, will equal the stated principal amount of the share of the Exit Term Loan Facility, or if either is publicly traded, will equal the fair market value of the Allowed Claims if such Allowed Claim is publicly traded and the fair market value of the share of the Exit Term Loan Facility (as of the date it is distributed to the Holder) if the Exit Term Loan Facility is publicly traded) (the "**_Issue Price_**") received in exchange for the Allowed Claims and (ii) the fair market value of the New Common Stock (as of the date the they are distributed to the Holder) received in exchange for the Allowed Claims; and (b) the Holder's adjusted basis, if any, in the Allowed Claims. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and

market discount below. A Holder's tax basis in the share of the Exit Term Loan Facility should equal its Issue Price and a Holder's tax basis in the New Common Stock should equal its fair market value as of the Effective Date. A Holder's holding period for the share of the Exit Term Loan Facility and New Common Stock should begin on the day following the Effective Date.

In the event the Debtors select a "topping" bid that differs from the proposed Plan, Holders of Allowed Class 3 Prepetition First Lien Lender Claims may be exchanged for (i) their Pro Rata share of Cash, (ii) their Pro Rata share of the Staple Loan Facility and Cash or (iii) such other consideration as agreed in writing by the Prepetition First Lien Steering Committee and DIP Lenders.

If the Holders of Allowed Class 3 Claims exchange their Allowed Claims for Cash, a Holder will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

If the Holders of Allowed Class 3 Claims exchange their Allowed Claims for their Pro Rata share of the Staple Term Loan Facility and Cash, the U.S. federal income tax consequences of the "topping" bid to Holders of such Allowed Claims will depend, in part, on whether the Claims surrendered and Staple Term Loan Facility received constitute "securities" for U.S. federal income tax purposes.

To the extent that both the Prepetition First Lien Lender Claims and the Staple Term Loan Facility are treated as "securities," then the exchange in accordance with the "topping" bid of such Allowed Claims for a Pro Rata share of the Staple Term Loan Facility should be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, a Holder should not recognize any gain or loss on the exchange, except that a Holder should recognize any gain (but not loss) on the exchange to the extent of the lesser of the amount of gain realized on the exchange (generally equal to the fair market value of all of the consideration received minus the Holder's adjusted basis, if any, in the Allowed Claims) and the Cash. Such gain should be capital in nature so long as the Allowed Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain if the Holder has a holding period for Allowed Claims of more than one year. To the extent that a portion of the consideration received in exchange for the Allowed Claims is allocable to accrued interest, the Holder may recognize ordinary income (see Article IX.A.4 below, "*Accrued Interest*"). Such Holder should obtain a tax basis in the share of the Staple Term Loan Facility received equal to (a) the tax basis of the Allowed Claims surrendered, less (b) the Cash received, plus (c) gain recognized (if any), and should have a holding period for the share of the Staple Term Loan Facility that includes the holding period for the Allowed Claims exchanged therefore, provided, however, that the tax basis of the share of the Staple Term Loan Facility (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of the Staple Term Loan Facility (or portion thereof) should begin on the day following the Effective Date.

To the extent that either the Prepetition First Lien Lender Claims or the Staple Term Loan Facility are not treated as "securities," a Holder of such Allowed Claims should be treated as exchanging its Allowed Claims in a taxable exchange under section 1001 of the Tax Code. Accordingly, each Holder of such Allowed Claims should recognize capital gain or loss equal to the difference between: (a) the sum of (i) the Issue Price of the share of the Staple Term Loan Facility received in exchange for the Allowed Claims and (ii) the Cash received in exchange for the Allowed Claims; and (b) the Holder's adjusted basis, if any, in the Allowed Claims. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in the share of the Staple Term Loan Facility should equal their Issue Price as of the Effective Date. A Holder's holding period for the share of the Staple Term Loan Facility should begin on the day following the Effective Date.

The tax consequences of the Plan and a "topping" bid to the Holders of Allowed Class 3 Claims are highly uncertain. Holders of Allowed Class 3 Claims should consult their tax advisors regarding whether such Claims, the Exit Term Loan Facility and the Staple Term Loan Facility could be treated as "securities" for U.S. federal income tax purposes.

### 3. Consequences to Holders of Allowed Claims in Classes 4 and 6

Pursuant to the Plan, the Holders of Class 4 Prepetition Second Lien Lender Claims and Class 6 General Unsecured Claims will not receive any distribution on account of such Claims and will be discharged.

In the event the Debtors select a "topping" bid that differs from the proposed Plan, the Holders of Allowed Class 4 Prepetition Second Lien Lender Claims and Class 6 General Unsecured Claims may be exchanged for Cash, to the extent Cash is available for payment to such Holders pursuant to the absolute priority rule. In such case, a Holder will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

### 4. Accrued Interest

A portion of the consideration received by Holders of Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 5. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of

the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

### 6.    Information Reporting and Backup Withholding

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding (currently at a rate of 28%).  Backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the Holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided*, *however*, that the required information is timely provided to the Internal Revenue Service.

The Debtors will, through the Distribution Agent, withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE REORGANIZED DEBTORS

### 1.    Cancellation of Debt and Reduction of Tax Attributes

Under the Tax Code, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of indebtedness income ("***COD Income***") avoided. Generally, the reduction in the tax basis in assets cannot exceed the excess of the total basis of the debtors' property held immediately after the debt discharge over the total liabilities of the debtors immediately after the debt discharge.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to the reduction of certain remaining consolidated tax attributes of the affiliated group. Because the Plan provides that Holders of certain Allowed Claims will receive the Exit Term Loan Facility and New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the issue price of the Exit Term Loan Facility and the fair market value of the New Common Stock exchanged therefor. This value cannot be known with certainty until after the Effective Date. However, as a result of Consummation, the Debtors expect that there will be material reductions in NOLs, NOL carryforwards and other tax attributes including the Reorganized Debtors' tax basis in their assets.

## 2. Limitation of NOL Carry Forwards and Other Tax Attributes

The Reorganized Debtors may have NOL carryovers and other tax attributes at emergence. The amount of such NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: (a) the amount of tax losses incurred by the Debtors in 2010 and 2011 and (b) the amount of COD Income incurred by the Debtors in connection with Consummation that will result in a reduction of tax attributes, as discussed above. Following Consummation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers and, possibly, certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change), of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, the "***Pre-Change Losses***") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 are complicated, but as a general matter, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### a. General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (1) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (2) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 4.17%). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### b. Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after Consummation, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

The Debtors have not yet determined whether to utilize the 382(l)(5) Exception. In the event that the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of any remaining NOLs after the

Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date. With respect to any ownership change after the Effective Date, NOLs and other tax attributes attributable to the period prior to the Effective Date are treated as Pre-Change Losses for the latter ownership change as well, with the result that such NOLs will be subject to the smaller of the earlier annual limitation and any later annual limitations.

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Reorganized Debtor to owe a modest amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

## X. GLOSSARY OF DEFINED TERMS

### A. RULES OF INTERPRETATION

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

### B. DEFINED TERMS

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*2002 List*" means the list of parties who have filed a request for service of papers pursuant to Bankruptcy Rule 2002, maintained by the Notice and Claims Agent.

2.      "*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

3.      "*Administrative Claim*" means a Claim (other than First Lien Adequate Protection Claims and DIP Facility Claims) for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930.

4.      "*Administrative Claims Bar Date*" means the date that is the 45th day after the Effective Date.

5.      "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

6.      "*Allowed*" means with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be filed); (b) any Claim that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim has been timely filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court (including pursuant to any stipulation approved by the Bankruptcy Court); provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; provided further that the Claims described in clauses (a), (b), and (c) above shall not include any Claim on account of a right, option, warrant, right to convert, or other right to purchase an Equity Interest.  Except as otherwise specified in the Plan or an order of the Bankruptcy Court or with respect to Priority Tax Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  Any Claim that has been listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

7.      "*Assumed Executory Contract/Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and that shall be in form and substance reasonably acceptable to the Prepetition First Lien Steering Committee, of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the Plan.

8.      "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.      "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Debtors' Notice and Claims Agent on or before the Voting Deadline.

10.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

11.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

12.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

13.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

14.     "*Bylaws*" means the bylaws of Reorganized Holdings, substantially in the form included in the Plan Supplement.

15.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

16.     "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

17.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

18.     "*Certificate of Incorporation*" means the certificate of incorporation of Reorganized Holdings, substantially in the form included in the Plan Supplement.

19.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

20.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

21.     "*Claims Bar Date*" means, as applicable, (a) July 8, 2011 at 5:00 p.m. prevailing Eastern Time (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order.

22.     "*Claims Bar Date Order*" means that certain Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Procedures for Filing Proofs of Claim and (III) Approving Notice Thereof, entered by the Bankruptcy Court on May 26, 2011 [Docket No. 232], as may be amended from time to time.

23.     "*Claims Register*" means the official register of Claims and Interests maintained by the Notice and Claims Agent.

24.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

25.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

26.     "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

27. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

28. "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

29. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List, which date shall be no fewer than ten (10) days prior to the Voting Deadline.

31. "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases on April 12, 2011, pursuant to section 1102 of the Bankruptcy Code.

32. "*Cure Claim*" *means* a Claim based upon the Debtors' default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

33. "*DIP Agent*" means Cantor Fitzgerald Securities in its capacity as administrative agent and collateral agent under the DIP Facility.

34. "*DIP Facility*" means that certain $35,000,000 Credit and Guarantee Agreement, dated as of April 3, 2011, among Sbarro, Inc., as borrower, Sbarro Holdings, LLC and each direct and indirect, existing and future domestic subsidiary of Sbarro Holdings, LLC, as guarantors, the DIP Agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

35. "*DIP Facility Claim*" means any Claim held by the DIP Lenders arising under or related to the DIP Facility.

36. "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

37. "*Disclosure Statement*" means the disclosure statement for the Plan, including, without limitation, all exhibits and schedules thereto, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

*38.* "*Disputed Claim*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39. "*Distribution Agent*" means the Debtors or any Entity or Entities chosen by the Debtors, which Entities may include the Notice and Claims Agent, to make or to facilitate distributions required by the Plan.

40. "*Distribution Record Date*" means the date for determining which Holders of Claims or Equity Interests are eligible to receive distributions under the plan, which date shall be five (5) days after the Confirmation Date or such other date as designated in an order of the Bankruptcy Court.

41. "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

K&E 19518290

42.     "*Effective Date*" means the date selected by the Debtors that is a Business Day no later than 20 Business Days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.A of the Plan have been (i) satisfied or (ii) waived pursuant to Article VIII.A of the Plan.

43.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

44.     "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date; provided that Equity Interest does not include any Intercompany Interest.

45.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

46.     "*Exculpated Parties*" means, collectively: (a) the Reorganized Debtors; and (b) the Released Parties.

47.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

48.     "*Existing Letters of Credit*" means the letters of credit set forth in Exhibit 1 to the Plan.

49.     "*Exit Credit Documents*" means all loans and security documents relating to the Exit Financing, in each case as the same may be amended, restated, supplemented, or otherwise modified from time to time.

50.     "*Exit Financing*" means, collectively, a $110 million senior secured term loan facility (the Exit Term Loan Facility) and an $18.6 million senior secured multiple draw first-out new money credit facility (the New Money Exit Facility) pursuant to which the Reorganized Debtors will have approximately $[●] million in funded debt on the Effective Date.

51.     "*Exit Term Loan Facility*" means a $110 million senior secured term loan facility to be converted (a) first from the DIP Facility on a dollar for dollar basis based on outstanding loans under the DIP Facility on the Effective Date and (b) then from the Prepetition First Lien Facility.  The terms of the Exit Term Loan Facility shall be substantially consistent with those set forth on the term sheet attached to the Plan as Exhibit 2.  The Exit Term Loan Facility may be an amendment and restatement or a replacement of the Prepetition First Lien Credit Facility.

52.     "*Final DIP Order*" means that certain Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Lenders and (III) Granting Related Relief, entered by the Bankruptcy Court on May 4, 2011 [Docket No. 163], as may be amended from time to time in accordance with the terms thereof and the DIP Facility.

53.     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure or any motion for a new trial, reargument, or rehearing has been resolved by the court in which such motion was filed; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

54. "*First Lien Adequate Protection Claims*" means all adequate protection claims arising under applicable law or pursuant to the Final DIP Order.

55. "*General Administrative Claim*" means any Administrative Claim, including Cure Claims, other than a Professional Fee Claim.

56. "*General Unsecured Claims*" means any unsecured claim (other than an Administrative Claim; a Priority Tax Claim; an Other Priority Claim; Unsecured Ongoing Operations Claims; or an Intercompany Claim) against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto, and (c) Senior Notes Claims.

57. "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

58. "*Governmental Bar Date*" means 5:00 p.m. prevailing Eastern Time on October 3, 2011, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

59. "*Holder*" means an Entity holding a Claim or Interest.

60. "*Impaired*" means any Claim or Interest in an Impaired Class.

61. "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

62. "*Indemnified Parties*" means the Debtors' current directors, officers, managers, employees, attorneys, other professionals, and agents, and such current directors', officers', managers', and employees' respective Affiliates to the extent set forth in the Plan that were employed in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

63. "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, employees, or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

64. "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence, for each Class entitled to receive distributions.

65. "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

66. "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

67. "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

68. "*Interim Compensation Order*" means that certain Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, entered by the Bankruptcy Court on May 3, 2011 [Docket No. 147], as may be amended from time to time, including by an order entered by the Bankruptcy Court approving the retention of a specific Retained Professional.

K&E 19518290

69. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

70. "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

71. "*Management Compensation Plan*" means that certain key employee cash incentive program agreed to among the Debtors and the Prepetition First Lien Steering Committee on August 9, 2011, substantially in the form set forth in the Plan Supplement.

72. "*Management Equity Plan*" means the management incentive plan of the Reorganized Debtors, which management incentive plan will be established and implemented by the New Board as soon as reasonably practicable following the Effective Date and pursuant to which retentive and performance-based equity awards (in the form to be determined by the New Board) of no less than 1/2 of the Reserved Employee Equity shall be allocated to certain key employees of the Reorganized Debtors and members of the New Board, a portion of which may be reserved by the New Board for allocation to the Reorganized Debtors' chief executive officer if the selection process for such chief executive officer has not then been completed.[7]

73. "*Master Service List*" means the list of certain key parties in interest that are served with pleadings filed in these Chapter 11 Cases, maintained by the Notice and Claims Agent.

74. "*New Board*" means the initial board of directors of Reorganized Holdings.

75. "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued, or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

76. "*New Money Exit Facility*" means an $18.6 million senior secured multiple draw first-out new money term loan facility to be provided by certain of the Prepetition First Lien Lenders. The terms of the New Money Exit Facility shall be substantially consistent with those set forth on the term sheet attached as <u>Exhibit 3</u> to the Plan.

77. "*Notice and Claims Agent*" means Epiq Bankruptcy Solutions LLC, in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to (a) that certain Order Authorizing and Approving the Employment of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent to the Debtors *Nunc Pro Tunc* to the Petition Date, entered by the Bankruptcy Court on April 5, 2011 [Docket No. 44] and (b) that certain Order Authorizing and Approving the Retention of Epiq Bankruptcy Solutions, LLC as Administrative Agent to the Debtors *Nunc Pro Tunc* to the Petition Date, entered by the Bankruptcy Court on May 3, 2011 [Docket No. 149], as may be amended from time to time.

78. "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

79. "*Other Secured Claim*" means any Secured Claim against the Debtors not specifically described in the Plan; <u>provided</u>, <u>however</u>, that Other Secured Claims shall not include DIP Facility Claims, Prepetition First Lien Lender Claims, and Prepetition Second Lien Lender Claims.

80. "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediate preceding Periodic Distribution Date.

81. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

---

[7] The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Debtors and the Prepetition First Lien Steering Committee and are subject to change.

82.     "*Petition Date*" means April 4, 2011.

83.      "*Plan Equity Value*" means between [●] and [●].

84.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents:  (a) the Exit Credit Documents; (b) the Assumed Executory Contract/ Unexpired Lease List and the Rejected Executory Contract/ Unexpired Lease List; (c) the Shareholders Agreement; (d) the Certificate of Incorporation; (e) the Bylaws; (f) to the extent known, the identity of the members of the New Board; and (g) the form of the Management Compensation Plan.

85.     "*Plan Supplement Filing Date*" means the date that is ten (10) days prior to the Voting Deadline.

86.     "*Prepetition First Lien Steering Committee*" means that certain steering committee of secured lenders holding Prepetition First Lien Lender Claims.

87.     "*Prepetition First Lien Agent*" means Cantor Fitzgerald Securities, in its capacity as successor administrative agent and collateral agent under the Prepetition First Lien Facility.

88.     "*Prepetition First Lien Credit Facility*" means the secured loan facility under that certain Amended and Restated Credit and Guarantee Agreement dated as of January 31, 2007, among Sbarro, Inc., certain of its subsidiaries, the Prepetition First Lien Agent and other lenders party thereto, as amended.

89.     "*Prepetition First Lien Lender Claims*" means all Claims arising under the Prepetition First Lien Loan Documents or applicable law, including all First Lien Adequate Protection Claims.

90.     "*Prepetition First Lien Lenders*" means those banks, financial institutions, and other lenders under the Prepetition First Lien Facility, from time to time, in their capacity as such.

91.     "*Prepetition First Lien Loan Documents*" means each of the documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition First Lien Facility.

92.     "*Prepetition Second Lien Agent*" means Wilmington Trust FSB, in its capacity as successor administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement.

93.     "*Prepetition Second Lien Credit Agreement*" means that certain Amended and Restated Credit and Guarantee Agreement dated as of March 26, 2009, among Sbarro, Inc., certain of its subsidiaries, the Prepetition Second Lien Agent, and other lenders party thereto, as amended.

94.     "*Prepetition Second Lien Lender Claims*" means all Claims arising out of the Prepetition Second Lien Loan Documents or applicable law.

95.     "*Prepetition Second Lien Lenders*" means those banks, financial institutions, and other lenders parties to the Prepetition Second Lien Credit Agreement, from time to time, in their capacity as such.

96.     "*Prepetition Second Lien Loan Documents*" means each of the documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Second Lien Credit Agreement.

97.     "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

K&E 19518290

**98.** "*Professional Fee Claim*" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

**99.** "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

**100.** "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.A.2(d) of the Plan.

101. "*Proof of Claim*" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

102. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion of a particular recovery that a Class is entitled to share with other Classes entitled to the same recovery under the Plan.

103. "*Rejected Executory Contract/Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and that shall be reasonably acceptable in form and substance to the Prepetition First Lien Steering Committee, of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the Plan.

104. "*Released Parties*" means, collectively (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition First Lien Agent and the Prepetition First Lien Lenders, (c) the DIP Agent and the DIP Lenders, (d) the Creditors' Committee and all current and former members thereof and (e) with respect to each of the Persons named in (a) – (d) above, such Entity's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

105. "*Releasing Parties*" means, collectively, (a) the Prepetition First Lien Agent and the members of the Prepetition First Lien Steering Committee, (b) the DIP Agent and the DIP Lenders, (c) the Creditors' Committee and the members thereof, and (d) each Holder of a Claim that affirmatively votes to accept the Plan, each solely in its capacity as such.

106. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107. "*Reorganized Holdings*" means Sbarro Holdings, LLC., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

108. "*Reorganized Sbarro*" means Sbarro, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

109. "*Representatives*" means, with regard to an Entity, current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents, and other representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

110. "*Reserved Employee Equity*" means 10% of the New Common Stock to be issued under the Plan (on a fully-diluted basis), which stock shall be (i) authorized and reserved on account of the Management Equity

Plan and other future employee equity compensation or incentive programs as determined by the New Board provided that no option granted pursuant to any such programs shall have an exercise price below the fair market value of the New Common Stock at the time of the grant and (ii) subject to the applicable provisions of the Shareholders' Agreement.[8]

111. "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

112. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

113. "*Section 510(b) Claims*" means any Claim against a Debtor that is subordinated pursuant to section 510(b) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Equity Interest, any claim for damages arising from the purchase or sale of any Equity Interest, or any claim for reimbursement, contribution or indemnification for such Claim.

114. "*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the New Common Stock.

115. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, or any similar federal, state, or local law.

116. "*Senior Notes*" means the unsecured 10.375% senior notes due 2015 issued pursuant to the Senior Notes Indenture.

117. "*Senior Notes Claims*" means all claims arising out of the Senior Notes Indenture.

118. "*Senior Notes Indenture*" means that certain Indenture dated as of January 31, 2007, among Sbarro, Inc., as issuer, certain Affiliates of Sbarro, Inc., as guarantors, and the Senior Notes Indenture Trustee, as amended, supplemented or otherwise modified from time to time through the Petition Date.

119. "*Senior Notes Indenture Trustee*" means The Bank of New York, or its successor.

120. "*Servicer*" means an indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

121. "*Shareholders Agreement*" means the stockholders' agreement with respect to the New Common Stock to be effective on the Effective Date, which shall be included in the Plan Supplement, and which shall be in form and substance reasonably satisfactory to the Prepetition First Lien Steering Committee.

122. "*Staple Term Loan Facility*" means a $110 million senior secured term loan facility, the terms of which will have been made available to any Qualified Bidder.

123. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

---

[8] The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Debtors and the Prepetition First Lien Steering Committee and are subject to change.

124.    "*Unimpaired*" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

125.    "*United States Trustee*" means the United States Trustee for the Southern District of New York.

126.    "*Unsecured Ongoing Operations Claims*" means all general unsecured Claims directly related to and arising solely from the receipt of goods and services by the Debtors arising with and held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; provided, however, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

127.    "*Unsecured Ongoing Operations Claims Distribution*" means $250,000.

128.    "*Voting Deadline*" means [5:00 p.m., prevailing Eastern Time, on [_____], 2011].

129.    "*Voting Record Date*" means [_____], 2011.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

K&E 19518290

# XI. CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Debtors' Notice and Claims Agent, no later than 5:00 p.m. prevailing Eastern Time on _____, 2011.

Dated: August 9, 2011

Respectfully submitted,

**SBARRO, INC. (on behalf of itself and all other Debtors)**

By: /s/ _____
Name: Nicholas McGrane
Title: Chief Executive Officer of Sbarro

Prepared by:

James H.M. Sprayregen, P.C.
Edward O. Sassower
Nicole L. Greenblatt
Paul Wierbicki (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**Exhibit A**

**Joint Plan of Reorganization**

James H.M. Sprayregen, P.C.
Edward O. Sassower
Nicole L. Greenblatt
Paul Wierbicki (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SBARRO, INC., *et al.*,[1] | ) | Case No. 11-11527 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## PROPOSED JOINT CHAPTER 11 PLAN
## OF REORGANIZATION OF SBARRO, INC. AND ITS DEBTOR AFFILIATES

**THIS DRAFT PLAN OF REORGANIZATION IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

Dated: August 9, 2011

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sbarro, Inc. (1939); Sbarro Holdings, LLC (3819); Carmela's of Kirkman Operating, LLC (1182); Carmela's of Kirkman LLC (7703); Carmela's, LLC (8088); Corest Management, Inc. (9134); Demefac Leasing Corp. (2379); Larkfield Equipment Corp. (7947); Las Vegas Convention Center LLC (7645); Sbarro America Properties, Inc. (9540); Sbarro America, Inc. (9130); Sbarro Blue Bell Express LLC (1419); Sbarro Commack, Inc. (4007); Sbarro Express LLC (0253); Sbarro New Hyde Park, Inc. (6185); Sbarro of Las Vegas, Inc. (2853); Sbarro of Longwood, LLC (0328); Sbarro of Virginia, Inc. (2309); Sbarro Pennsylvania, Inc. (3530); Sbarro Properties, Inc. (9541); Sbarro Venture, Inc. (3182); Sbarro's of Texas, Inc. (5139); Umberto at the Source, LLC (8024); Umberto Deer Park, LLC (8728); Umberto Hauppauge, LLC (8245); Umberto Hicksville, LLC (0989); Umberto Huntington, LLC (8890); and Umberto White Plains, LLC (8159). The Debtors' service address is: 401 Broadhollow Road, Melville, New York 11747.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ................................................................. 1
    A.      Rules of Interpretation ........................................................................................................ 1
    B.      Defined Terms .................................................................................................................... 1

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS,  PRIORITY TAX CLAIMS,
    AND UNITED STATES TRUSTEE STATUTORY FEES ................................................................ 10
    A.      Administrative Claims ...................................................................................................... 10
    B.      DIP Facility Claims .......................................................................................................... 12
    C.      Priority Tax Claims ........................................................................................................... 13
    D.      United States Trustee Statutory Fees ................................................................................ 13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................................. 13
    A.      Classification of Claims .................................................................................................... 13
    B.      Treatment of Claims and Interests Against the Debtors .................................................... 14
    C.      Intercompany Claims ........................................................................................................ 16
    D.      Special Provision Governing Unimpaired Claims ........................................................... 16
    E.      Acceptance or Rejection of the Plan ................................................................................. 16
    F.      Nonconsensual Confirmation ........................................................................................... 17
    G.      Subordinated Claims ......................................................................................................... 17
    H.      Elimination of Vacant Classes ......................................................................................... 17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................................................. 17
    A.      General Settlement of Claims ........................................................................................... 17
    B.      Restructuring Transactions ............................................................................................... 17
    C.      Corporate Existence .......................................................................................................... 17
    D.      Vesting of Assets in the Reorganized Debtors ................................................................. 18
    E.      Indemnification Provisions in Organizational Documents ............................................... 18
    F.      Cancellation of Agreements, Senior Notes and Equity Interests ...................................... 18
    G.      Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors ............ 19
    H.      Approval of Exit Credit Documents .................................................................................. 19
    I.      Reorganized Debtors' Equity Interests ............................................................................. 20
    J.      Section 1145 Exemption ................................................................................................... 20
    K.      Organizational Documents ................................................................................................ 21
    L.      Effectuating Documents; Further Transactions ................................................................ 21
    M.      Exemption from Certain Transfer Taxes and Recording Fees .......................................... 21
    N.      Directors and Officers of Reorganized Holdings and the Other Reorganized Debtors ... 21
    O.      Preservation of Rights of Action ...................................................................................... 22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES;
    EMPLOYEE BENEFITS; AND INSURANCE POLICIES ............................................................... 23
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 23
    B.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................... 23
    C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases ..................... 24
    D.      Contracts and Leases Entered Into After the Petition Date .............................................. 24
    E.      Reservation of Rights ........................................................................................................ 24
    F.      Assumption of Directors and Officers Insurance Policies ............................................... 24
    G.      Indemnification and Reimbursement Obligations ............................................................ 24
    H.      Employee Compensation and Benefits ............................................................................. 25

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................................... 26
    A.      Distribution on Account of Claims and Interests Allowed as of the Effective Date ........ 26
    B.      Distributions on Account of Claims and Interests Allowed After the Effective Date ...... 26

C.   Timing and Calculation of Amounts to Be Distributed ...............................................27
D.   Delivery of Distributions ...........................................................................................27
E.   Compliance with Tax Requirements/Allocations.........................................................29
F.   Setoffs .........................................................................................................................30
G.   Surrender of Canceled Instruments or Securities .......................................................30
H.   Claims Paid or Payable by Third Parties.....................................................................30

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
     UNLIQUIDATED CLAIMS OR EQUITY INTERESTS ................................................31
A.   Allowance of Claims and Interests...............................................................................31
B.   Prosecution of Objections to Claims............................................................................31
C.   Estimation of Claims and Interests...............................................................................31
D.   Adjustment to Claims and Interests Without Objection ..............................................32
E.   Disallowance of Claims or Interests.............................................................................32
F.   Offer of Judgment ........................................................................................................32
G.   Amendments to Claims ................................................................................................32

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE........................32
A.   Conditions Precedent to the Effective Date .................................................................32
B.   Waiver of Conditions ...................................................................................................33
C.   Effect of Non-Occurrence of Conditions to the Effective Date ..................................33

ARTICLE IX. RELEASE, INJUNCTIVE, AND RELATED PROVISIONS .........................33
A.   Discharge of Claims and Termination of Interests.......................................................33
B.   **Releases by the Debtors** ........................................................................................34
C.   **Releases by Holders of Claims and Equity Interests** ..........................................34
D.   **Exculpation** ..........................................................................................................35
E.   **Injunction** ..............................................................................................................36
F.   Setoffs .........................................................................................................................36
G.   Release of Liens ...........................................................................................................36

ARTICLE X. RETENTION OF JURISDICTION .................................................................36

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN...............38
A.   Modification of Plan.....................................................................................................38
B.   Effect of Confirmation on Modifications .....................................................................38
C.   Revocation of Plan .......................................................................................................38

ARTICLE XII. MISCELLANEOUS PROVISIONS ..............................................................38
A.   Immediate Binding Effect.............................................................................................38
B.   Additional Documents ..................................................................................................39
C.   Payment of Statutory Fees ...........................................................................................39
D.   Reservation of Rights ...................................................................................................39
E.   Successors and Assigns.................................................................................................39
F.   Service of Documents ...................................................................................................39
G.   Term of Injunctions or Stays........................................................................................40
H.   Entire Agreement ..........................................................................................................40
I.   Governing Law .............................................................................................................40
J.   Exhibits ........................................................................................................................41
K.   Nonseverability of Plan Provisions upon Confirmation...............................................41
L.   Closing of Chapter 11 Cases ........................................................................................41
M.   Conflicts .......................................................................................................................41
N.   Dissolution of Creditors' Committee ...........................................................................41
O.   Section 1125(e) Good Faith Compliance .....................................................................41
P.   Further Assurances........................................................................................................42
Q.   No Stay of Confirmation Order.....................................................................................42

08/10/2011 2:31 AM

# PROPOSED JOINT CHAPTER 11 PLAN
## OF REORGANIZATION OF SBARRO, INC. AND ITS DEBTOR AFFILIATES

Sbarro, Inc. and 27 of its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), propose the following joint plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Debtors. These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I.B of the Plan.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan. Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

A.      *Rules of Interpretation*

1.      For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

B.      *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses. To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.      "*Administrative Claim*" means a Claim (other than First Lien Adequate Protection Claims and DIP Facility Claims) for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and

through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

3.  "*Administrative Claims Bar Date*" means the date that is the 45th day after the Effective Date.

4.  "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.  "*Allowed*" means with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be filed); (b) any Claim that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim has been timely filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court (including pursuant to any stipulation approved by the Bankruptcy Court); provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; provided further that the Claims described in clauses (a), (b), and (c) above shall not include any Claim on account of a right, option, warrant, right to convert, or other right to purchase an Equity Interest.  Except as otherwise specified in the Plan or an order of the Bankruptcy Court or with respect to Priority Tax Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  Any Claim that has been listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

6.  "*Assumed Executory Contract/Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and that shall be in form and substance reasonably acceptable to the Prepetition First Lien Steering Committee, of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the Plan.

7.  "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

8.  "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Debtors' Notice and Claims Agent on or before the Voting Deadline.

9.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

10.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

11.  "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

12.  "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

13.  "*Bylaws*" means the bylaws of Reorganized Holdings, substantially in the form included in the Plan Supplement.

14.  "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

15.     "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

16.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

17.     "*Certificate of Incorporation*" means the certificate of incorporation of Reorganized Holdings, substantially in the form included in the Plan Supplement.

18.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

19.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

20.     "*Claims Bar Date*" means, as applicable, (a) July 8, 2011 at 5:00 p.m. prevailing Eastern Time (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order.

21.     "*Claims Bar Date Order*" means that certain Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Procedures for Filing Proofs of Claim and (III) Approving Notice Thereof, entered by the Bankruptcy Court on May 26, 2011 [Docket No. 232], as may be amended from time to time.

22.     "*Claims Register*" means the official register of Claims and Interests maintained by the Notice and Claims Agent.

23.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

25.     "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

26.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

28.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List, which date shall be no fewer than ten (10) days prior to the Voting Deadline.

30.     "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases on April 12, 2011, pursuant to section 1102 of the Bankruptcy Code.

31.     "*Cure Claim*" *means* a Claim based upon the Debtors' default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

32.     "*DIP Agent*" means Cantor Fitzgerald Securities in its capacity as administrative agent and collateral agent under the DIP Facility.

33.     "*DIP Facility*" means that certain $35,000,000 Credit and Guarantee Agreement, dated as of April 3, 2011, among Sbarro, Inc., as borrower, Sbarro Holdings, LLC and each direct and indirect, existing and future domestic subsidiary of Sbarro Holdings, LLC, as guarantors, the DIP Agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

34.     "*DIP Facility Claim*" means any Claim held by the DIP Lenders arising under or related to the DIP Facility.

35.     "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

36.     "*Disclosure Statement*" means the disclosure statement for the Plan, including, without limitation, all exhibits and schedules thereto, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

37.     "*Disputed Claim*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

38.     "*Distribution Agent*" means the Debtors or any Entity or Entities chosen by the Debtors, which Entities may include the Notice and Claims Agent, to make or to facilitate distributions required by the Plan.

39.     "*Distribution Record Date*" means the date for determining which Holders of Claims or Equity Interests are eligible to receive distributions under the plan, which date shall be five (5) days after the Confirmation Date or such other date as designated in an order of the Bankruptcy Court.

40.     "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

41.     "*Effective Date*" means the date selected by the Debtors that is a Business Day no later than 20 Business Days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.A have been (i) satisfied or (ii) waived pursuant to Article VIII.A.

42.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

43.     "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date; provided that Equity Interest does not include any Intercompany Interest.

44.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

45.     "*Exculpated Parties*" means, collectively: (a)  the Reorganized Debtors; and (b) the Released Parties.

46. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

47. "*Existing Letters of Credit*" means the letters of credit set forth in <u>Exhibit 1</u>.

48. "*Exit Credit Documents*" means all loans and security documents relating to the Exit Financing, in each case as the same may be amended, restated, supplemented, or otherwise modified from time to time.

49. "*Exit Financing*" means, collectively, a $110 million senior secured term loan facility (the Exit Term Loan Facility) and an $18.6 million senior secured multiple draw first-out new money credit facility (the New Money Exit Facility) pursuant to which the Reorganized Debtors will have approximately $[●] million in funded debt on the Effective Date.

50. "*Exit Term Loan Facility*" means a $110 million senior secured term loan facility to be converted (a) first from the DIP Facility on a dollar for dollar basis based on outstanding loans under the DIP Facility on the Effective Date and (b) then from the Prepetition First Lien Facility. The terms of the Exit Term Loan Facility shall be substantially consistent with those set forth on the term sheet attached hereto as <u>Exhibit 2</u>. The Exit Term Loan Facility may be an amendment and restatement or a replacement of the Prepetition First Lien Credit Facility.

51. "*Final DIP Order*" means that certain Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Lenders and (III) Granting Related Relief, entered by the Bankruptcy Court on May 4, 2011 [Docket No. 163], as may be amended from time to time in accordance with the terms thereof and the DIP Facility.

52. "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure or any motion for a new trial, reargument, or rehearing has been resolved by the court in which such motion was filed; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

53. "*First Lien Adequate Protection Claims*" means all adequate protection claims arising under applicable law or pursuant to the Final DIP Order.

54. "*General Administrative Claim*" means any Administrative Claim, including Cure Claims, other than a Professional Fee Claim.

55. "*General Unsecured Claims*" means any unsecured claim (other than an Administrative Claim; a Priority Tax Claim; an Other Priority Claim; Unsecured Ongoing Operations Claims; or an Intercompany Claim) against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto, and (c) Senior Notes Claims.

56. "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

57. "*Governmental Bar Date*" means 5:00 p.m. prevailing Eastern Time on October 3, 2011, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

58. "*Holder*" means an Entity holding a Claim or Interest.

59.     "*Impaired*" means any Claim or Interest in an Impaired Class.

60.     "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

61.     "*Indemnified Parties*" means the Debtors' current directors, officers, managers, employees, attorneys, other professionals, and agents, and such current directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

62.     "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, employees, or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificates of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

63.     "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence for each Class entitled to receive distributions.

64.     "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

65.     "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

66.     "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

67.     "*Interim Compensation Order*" means that certain Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, entered by the Bankruptcy Court on May 3, 2011 [Docket No. 147], as may be amended from time to time, including by an order entered by the Bankruptcy Court approving the retention of a specific Retained Professional.

68.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

69.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

70.     "*Management Compensation Plan*" means that certain key employee cash incentive program agreed to among the Debtors and the Prepetition First Lien Steering Committee on August 9, 2011, substantially in the form set forth in the Plan Supplement.

71.     "*Management Equity Plan*" means the management incentive plan of the Reorganized Debtors, which management incentive plan will be established and implemented by the New Board as soon as reasonably practicable following the Effective Date and pursuant to which retentive and performance-based equity awards (in the form to be determined by the New Board) of no less than 1/2 of the Reserved Employee Equity shall be allocated to certain key employees of the Reorganized Debtors and members of the New Board, a portion of which may be reserved by the New Board for allocation to the Reorganized Debtors' chief executive officer if the selection process for such chief executive officer has not then been completed.[2]

72.     "*New Board*" means the initial board of directors of Reorganized Holdings.

---

[2]     The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Debtors and the Prepetition First Lien Steering Committee and are subject to change.

73.     "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued, or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

74.     "*New Money Exit Facility*" means an $18.6 million senior secured multiple draw first-out new money term loan facility to be provided by certain of the Prepetition First Lien Lenders.  The terms of the New Money Exit Facility shall be substantially consistent with those set forth on the term sheet attached hereto as <u>Exhibit 3</u>.

75.     "*Notice and Claims Agent*" means Epiq Bankruptcy Solutions LLC, in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to (a) that certain Order Authorizing and Approving the Employment of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent to the Debtors *Nunc Pro Tunc* to the Petition Date, entered by the Bankruptcy Court on April 5, 2011 [Docket No. 44] and (b) that certain Order Authorizing and Approving the Retention of Epiq Bankruptcy Solutions, LLC as Administrative Agent to the Debtors *Nunc Pro Tunc* to the Petition Date, entered by the Bankruptcy Court on May 3, 2011 [Docket No. 149], as may be amended from time to time.

76.     "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

77.     "*Other Secured Claim*" means any Secured Claim against the Debtors not specifically described herein; *provided*, <u>*however*</u>, that Other Secured Claims shall not include DIP Facility Claims, Prepetition First Lien Lender Claims, and Prepetition Second Lien Lender Claims.

78.     "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediate preceding Periodic Distribution Date.

79.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

80.     "*Petition Date*" means April 4, 2011.

81.     "*Plan*" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including, without limitation, all exhibits and schedules hereto and thereto.

82.     "*Plan Equity Value*" means between [●] and [●].

83.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents:  (a) the Exit Credit Documents; (b) the Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List; (c) the Shareholders Agreement; (d) the Certificate of Incorporation; (e) the Bylaws; (f) to the extent known, the identity of the members of the New Board; and (g) the form of the Management Compensation Plan.

84.     "*Plan Supplement Filing Date*" means the date that is ten (10) days prior to the Voting Deadline.

85.     "*Prepetition First Lien Steering Committee*" means that certain steering committee of secured lenders holding Prepetition First Lien Lender Claims.

86.     "*Prepetition First Lien Agent*" means Cantor Fitzgerald Securities, in its capacity as successor administrative agent and collateral agent under the Prepetition First Lien Facility.

87. "*Prepetition First Lien Credit Facility*" means the secured loan facility under that certain Amended and Restated Credit and Guarantee Agreement dated as of January 31, 2007, among Sbarro, Inc., certain of its subsidiaries, the Prepetition First Lien Agent and other lenders party thereto, as amended.

88. "*Prepetition First Lien Lender Claims*" means all Claims arising under the Prepetition First Lien Loan Documents or applicable law, including all First Lien Adequate Protection Claims.

89. "*Prepetition First Lien Lenders*" means those banks, financial institutions, and other lenders under the Prepetition First Lien Facility, from time to time, in their capacity as such.

90. "*Prepetition First Lien Loan Documents*" means each of the documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition First Lien Facility.

91. "*Prepetition Second Lien Agent*" means Wilmington Trust FSB, in its capacity as successor administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement.

92. "*Prepetition Second Lien Credit Agreement*" means that certain Amended and Restated Credit and Guarantee Agreement dated as of March 26, 2009, among Sbarro, Inc., certain of its subsidiaries, the Prepetition Second Lien Agent, and other lenders party thereto, as amended.

93. "*Prepetition Second Lien Lender Claims*" means all Claims arising out of the Prepetition Second Lien Loan Documents or applicable law.

94. "*Prepetition Second Lien Lenders*" means those banks, financial institutions, and other lenders parties to the Prepetition Second Lien Credit Agreement, from time to time, in their capacity as such.

95. "*Prepetition Second Lien Loan Documents*" means each of the documents, agreements, and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Second Lien Credit Agreement.

96. "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

97. "*Professional Fee Claim*" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

98. "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

99. "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.A.2(d) hereof.

100. "*Proof of Claim*" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

101. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion of a particular recovery that a Class is entitled to share with other Classes entitled to the same recovery under the Plan.

102. "*Rejected Executory Contract/Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and that shall be reasonably acceptable in form and substance to the Prepetition First Lien Steering Committee, of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the Plan.

103. "*Released Parties*" means, collectively (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition First Lien Agent and the Prepetition First Lien Lenders, (c) the DIP Agent and the DIP Lenders, (d) the Creditors' Committee and all current and former members thereof and (e) with respect to each of the Persons named in (a) – (d) above, such Entity's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

104. "*Releasing Parties*" means, collectively, (a) the Prepetition First Lien Agent and the members of the Prepetition First Lien Steering Committee, (b) the DIP Agent and the DIP Lenders, (c) the Creditors' Committee and the members thereof, and (d) each Holder of a Claim that affirmatively votes to accept the Plan, each solely in its capacity as such.

105. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

106. "*Reorganized Holdings*" means Sbarro Holdings, LLC, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107. "*Reorganized Sbarro*" means Sbarro, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

108. "*Representatives*" means, with regard to an Entity, current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents, and other representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

109. "*Reserved Employee Equity*" means 10% of the New Common Stock to be issued under the Plan (on a fully-diluted basis), which stock shall be (i) authorized and reserved on account of the Management Equity Plan and other future employee equity compensation or incentive programs as determined by the New Board provided that no option granted pursuant to any such programs shall have an exercise price below the fair market value of the New Common Stock at the time of the grant and (ii) subject to the applicable provisions of the Shareholders' Agreement.[3]

110. "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

111. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

112. "*Section 510(b) Claims*" means any Claim against a Debtor that is subordinated pursuant to section 510(b) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Equity Interest, any claim for damages arising from the purchase or sale of any Equity Interest, or any claim for reimbursement, contribution or indemnification for such Claim.

---

[3]  The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Debtors and the Prepetition First Lien Steering Committee and are subject to change.

113. "*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the New Common Stock.

114. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, or any similar federal, state, or local law.

115. "*Senior Notes*" means the unsecured 10.375% senior notes due 2015 issued pursuant to the Senior Notes Indenture.

116. "*Senior Notes Claims*" means all claims arising out of the Senior Notes Indenture.

117. "*Senior Notes Indenture*" means that certain Indenture dated as of January 31, 2007, among Sbarro, Inc., as issuer, certain Affiliates of Sbarro, Inc., as guarantors, and the Senior Notes Indenture Trustee, as amended, supplemented or otherwise modified from time to time through the Petition Date.

118. "*Senior Notes Indenture Trustee*" means The Bank of New York, or its successor.

119. "*Servicer*" means an indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

120. "*Shareholders Agreement*" means the stockholders agreement with respect to the New Common Stock to be effective on the Effective Date, which shall be included in the Plan Supplement and which shall be in form and substance reasonably satisfactory to the Prepetition First Lien Steering Committee.

121. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

122. "*Unimpaired*" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

123. "*United States Trustee*" means the United States Trustee for the Southern District of New York.

124. "*Unsecured Ongoing Operations Claims*" means all general unsecured Claims directly related to and arising solely from the receipt of goods and services by the Debtors held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; provided, however, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

125. "*Unsecured Ongoing Operations Claims Distribution*" means $250,000.

126. "*Voting Deadline*" means [5:00 p.m., prevailing Eastern Time, on [_____], 2011].

127. "*Voting Record Date*" means [_____], 2011.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

1.    <u>General Administrative Claims</u>

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtors agree to less favorable treatment

to such Holder, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that, Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided further that Allowed General Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court).

    2.    <u>Professional Claims</u>

    (a)    Final Fee Applications

All final requests for Professional Fee Claims shall be filed no later than 45 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

    (b)    Payment of Interim Amounts

Except as otherwise provided in the Plan, Retained Professionals shall be paid pursuant to the Interim Compensation Order.

    (c)    Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals, including with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. Such funds in the Professional Fee Escrow Account shall not constitute property of the Reorganized Debtors. The remaining amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

    (d)    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

    (e)    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by that Reorganized Debtor or the Creditors' Committee after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable claims for

compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and the Creditors' Committee. If the Reorganized Debtors or Creditors' Committee dispute the reasonableness of any such invoice, the Reorganized Debtors, Creditors' Committee or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein. Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, except to the limited extent set forth in Article XII.N of the Plan, the Debtors shall have no obligation to pay any compensation or expense reimbursement for the Creditors' Committee or its Retained Professionals after the Effective Date and nothing herein should be construed to suggest otherwise.

(f)     Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

3.     Administrative Claims Bar Date

All requests for payment of an Administrative Claim (other than DIP Facility Claims or Prepetition First Lien Lender Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than 45 days after the Effective Date. A notice setting forth the Administrative Claims Bar Date will be filed on the Bankruptcy Court's docket and posted on the Debtors' restructuring website. Further notice of the Administrative Claims Bar Date will be included in the notice of the Confirmation Date and be provided as may be directed by the Bankruptcy Court. No request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors may also choose to object to any Administrative Claim no later than 75 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.

Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**Any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register maintained by the Notice and Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.**

B.     *DIP Facility Claims*

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims (other than Claims under the DIP Facility that expressly survive the termination thereof), on the Effective Date, the DIP Facility Claims shall (a) convert on a dollar for dollar basis into the Exit Term Loan Facility pursuant to the Exit Credit Documents or (b) receive such other treatment as agreed by the Debtors and the applicable DIP Lender.

C.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder; *provided, however,* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.      *United States Trustee Statutory Fees*

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.[4]  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims, and Priority Tax Claims, as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

### Summary of Classification and Treatment of Claims and Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition First Lien Lender Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Second Lien Lender Claims | Impaired | Deemed to Reject |
| 5 | Unsecured Ongoing Operations Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Sbarro Holdings, LLC | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |

---

[4]      Distributions under the Plan are not on a Debtor by Debtor basis.

B.    *Treatment of Claims and Interests Against the Debtors*

1.    <u>*Class 1 — Other Priority Claims*</u>

(a)    *Classification*: Class 1 consists of all Other Priority Claims against the Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Priority Claim against the Debtors, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting*: Class 1 is Unimpaired and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    <u>*Class 2 — Other Secured Claims*</u>

(a)    *Classification*: Class 2 consists of all Other Secured Claims against the Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the sole discretion of the applicable Debtor, shall (i) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive such other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

(c)    *Voting*: Class 2 is Unimpaired and Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    <u>*Class 3 — Prepetition First Lien Lender Claims*</u>

(a)    *Classification*: Class 3 consists of Prepetition First Lien Lender Claims against the Debtors.

(b)    *Allowance*: On the Effective Date, Prepetition First Lien Lender Claims shall be deemed Allowed in the aggregate amount of [176,300,000].

(c)    *Treatment*: In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition First Lien Credit Agreement Claim, each Holder of an Allowed Prepetition First Lien Lender Claim shall receive its Pro Rata share of each of (i) the Exit Term Loan Facility and (ii) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution on account of the Reserved Employee Equity and/or shares issued in connection with Management Equity Plan).

Existing Letters of Credit shall be replaced or cash collateralized with the proceeds of the New Money Exit Facility to the extent necessary.

(d)     *Voting*:  Class 3 is Impaired and Holders of Class 3 Prepetition First Lien Lender Claims are entitled to vote to accept or reject the Plan.

4.     <u>*Class 4 — Prepetition Second Lien Lender Claims*</u>

(a)     *Classification*:  Class 4 consists of all Prepetition Second Lien Lender Claims against the Debtors.

(b)     *Treatment*:  Holders of Prepetition Second Lien Lender Claims shall not receive any distribution on account of such Prepetition Second Lien Lender Claims.  On the Effective Date, all Prepetition Second Lien Lender Claims shall be discharged.

(c)     *Voting*:  Class 4 is Impaired and Holders of Class 4 Prepetition Second Lien Lender Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 4 Prepetition Second Lien Lender Claims are not entitled to vote to accept or reject the Plan.

5.     <u>*Class 5 — Unsecured Ongoing Operations Claims*</u>

(a)     *Classification*: Class 5 consists of all Unsecured Ongoing Operations Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of such Unsecured Ongoing Operations Claim, each Holder of an Allowed Unsecured Ongoing Operations Claim shall receive its Pro Rata share of the Unsecured Ongoing Operations Distribution.

(c)     *Voting*:  Class 5 is Impaired and Holders of Class 5 Unsecured Ongoing Operations Claims are entitled to vote to accept or reject the Plan.

6.     <u>*Class 6 — General Unsecured Claims*</u>

(a)     *Classification*: Class 6 consists of all General Unsecured Claims against the Debtors.

(b)     *Treatment*:  Holders of General Unsecured Claims shall not receive any distribution on account of such General Unsecured Claims.   On the Effective Date, all General Unsecured Claims shall be discharged.

(c)     *Voting*:  Class 6 is Impaired and Holders of Class 6 General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.     <u>*Class 7 — Equity Interests in Sbarro Holdings, LLC*</u>

(a)     *Classification*: Class 7 consists of all Equity Interests in Sbarro Holdings, LLC.

(b)     *Treatment*:  Holders of Equity Interests in Sbarro Holdings, LLC shall not receive any distribution on account of such Equity Interests in Sbarro Holdings, LLC.  On the Effective Date, all Sbarro Holdings, LLC Equity Interests shall be discharged, cancelled, released, and extinguished.

(c)     *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests in Sbarro Holdings, LLC are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests in Sbarro Holdings, LLC are not entitled to vote to accept or reject the Plan.

8. *Class 8 — Intercompany Interests*

   (a)   *Classification*: Class 8 consists of all Intercompany Interests.

   (b)   *Treatment*:  Holders of Intercompany Interests shall be reinstated and the legal, equitable and contractual rights to which holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

   (c)   *Voting*:  Class 8 is Unimpaired and Holders of Class 8 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.   *Intercompany Claims*

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Debtors or the Reorganized Debtors, all Intercompany Claims will be: (i) preserved and reinstated, in full or in part; (ii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (iii) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; or (iv) contributed to the capital of the obligation entity.

D.   *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

E.   *Acceptance or Rejection of the Plan*

1.   Presumed Acceptance of Plan

Holders of Claims in Classes 1, 2, and 8 are Unimpaired under the Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

2.   Voting Classes

Each Holder of an Allowed Claim in Classes 3 and 5 shall be entitled to vote to accept or reject the Plan.

3.   Deemed Rejection of the Plan

Holders of Claims in Classes 4, 6, and 7 and Holders of Equity Interests in Class 8 are Impaired and shall receive no distributions under the Plan on account of their Claims or Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 4, 6, and 7 and Holders of Equity Interests in Class 8 are not entitled to vote on the Plan and the votes of such Holders shall not be solicited.

4.   Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class thereof, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.     *Nonconsensual Confirmation*

Except as otherwise specifically provided in the Plan, if an Impaired Class shall not accept the Plan by the requisite statutory majority provided in sections 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

G.     *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal or equitable subordination rights relating thereto.

H.     *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement of Claims*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.     *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate.

C.     *Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant

to the Plan and require no further action or approval. On the Effective Date, Reorganized Holdings shall file a certificate of conversion to corporation and the Certificate of Incorporation with the office of the Secretary of State of Delaware and shall thereby be converted into a Delaware corporation, governed by the Certificate of Incorporation and Bylaws.

D.   *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.   *Indemnification Provisions in Organizational Documents*

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees, or agents who were employed as directors, officers, employees, or agents of such Debtor, on or after the Petition Date at least to the same extent as the bylaws of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees', or agents' rights. Notwithstanding anything contained in this Plan, the Reorganized Debtors may in their sole discretion (but have no obligation to) honor each Indemnification Obligation to a director, officer or employee that was no longer employed by the Debtors in such capacity on or after the Petition Date provided that, for each such director, officer or employee, the Debtors shall be permitted to honor Indemnification Obligations only to the extent of available coverage under the applicable D&O Liability Insurance Policy.

F.   *Cancellation of Agreements, Senior Notes and Equity Interests*

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents, the Senior Notes Indenture, and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

1.   the DIP Facility shall continue in effect solely for the purpose of: (a) allowing Holders of the DIP Facility Claims to receive the distributions provided for hereunder and (b) allowing the DIP Agent to receive distributions from the Debtors and to make further distributions to the Holders of the DIP Facility Claims on account of such Claims, as set forth in Article VI of the Plan; (c) preserving the DIP Agent's right to indemnification from the Debtors pursuant and subject to the terms of the DIP Facility in respect of any claim or cause of action asserted against the DIP Agent;

2.      the Prepetition First Lien Loan Documents shall continue in effect solely for the purpose of: (a) allowing Holders of the Prepetition First Lien Lender Claims to receive the distributions provided for hereunder and (b) allowing the Prepetition First Lien Agent to receive distributions from the Debtors and to make further distributions to the Holders of the Prepetition First Lien Lender Claims on account of such Claims, as set forth in Article VI of the Plan; and (c) preserving the Prepetition First Lien Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition First Lien Loan Documents in respect of any claim or cause of action asserted against the Prepetition First Lien Agent; and

3.      the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; and _provided_, _further_, _however_, that at the election of the Prepetition First Lien Steering Committee, the Prepetition First Lien Credit Facility may remain in effect and be amended and restated consistent with the Exit Term Loan Facility.

G.      *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand, including cash from operations and the proceeds of the New Money Exit Facility. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

H.      *Exit Financing and Approval of Exit Credit Documents*

On the Effective Date, the Reorganized Debtors will have total funded debt of $[●] million, in the form of the Exit Term Loan Facility and amounts funded under the New Money Exit Facility. The Reorganized Debtors may use the Exit Financing for any purpose permitted by the governing documents, including the funding of obligations under the Plan, satisfaction of ongoing working capital needs, and to cash collateralize existing or replacement letters of credit.

Confirmation of the Plan shall be deemed approval of the Exit Financing (including the Exit Term Loan Facility and the New Money Exit Facility and all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Financing, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Credit Documents and such other documents as may be required or appropriate.

The Exit Credit Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Credit Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Credit Documents (1) shall be deemed to be approved, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Documents, (3) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Credit Documents, and (4) shall not be subject to avoidance, recharacterization, or

subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the Exit Credit Documents that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests, in each case all costs and expenses in connection therewith to be paid by the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Documents or any rights or remedies related thereto.

I.    *Reorganized Debtors' Equity Interests*

1.    <u>New Common Stock</u>

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Stock. The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition First Lien Lender Claims, subject to dilution on account of Reserved Employee Equity and/or shares issued in connection with the Management Equity Plan. From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of Reorganized Holdings, Reorganized Holdings shall have one class and one series of New Common Stock. The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved as Reserved Employee Equity and/or issued in connection with the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution. Distributions of New Common Stock to the Prepetition First Lien Lenders will only be made through broker accounts via electronic issuance of the Shares and Reorganized Holdings will not issue separate stock certificates.

2.    <u>Shareholders Agreement</u>

On the Effective Date, Reorganized Holdings and the holders of the New Common Stock shall enter into the Shareholders Agreement in substantially the form included in the Plan Supplement. The Shareholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

J.    *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution or sale of securities. In addition, except as otherwise provided in the Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Common Stock contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the

definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

K.     *Organizational Documents*

Subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Certificate of Incorporation and the Bylaws. From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code to the extent required by section 1123(a)(6) of the Bankruptcy Code.

L.     *Effectuating Documents; Further Transactions*

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors, managers, partners, or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers, partners, or members of the Debtors, or the need for any approvals, authorizations, actions, or consents.

M.     *Exemption from Certain Transfer Taxes and Recording Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.     *Directors and Officers of Reorganized Holdings and the Other Reorganized Debtors*

1.     <u>The New Board</u>

The New Board shall consist of five directors selected by the Prepetition First Lien Steering Committee in consultation with the Debtors and subject to background checks reasonably satisfactory to the Debtors. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing. The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

2.     Senior Management

Prior to the Confirmation Hearing, the Debtors will have engaged a search firm acceptable to the Prepetition First Lien Steering Committee to conduct a process for selection of the Reorganized Debtors' chief executive officer. The Debtors' interim chief executive officer as of the Petition Date shall be considered as a candidate without deference to his incumbency.

The existing officers of the Debtors as of the Petition Date (including the Debtors' interim chief executive officer unless and until a replacement chief executive officer is selected) shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements.

O.     *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in Article IX below, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Subject to the releases set forth in Article IX below, the Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

# ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed assumed as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (a) identified on the Rejected Executory Contract/Unexpired Lease List (which shall be filed with the Bankruptcy Court on the Contract/Lease Schedule Date) as an Executory Contract or Unexpired Lease designated for rejection, or (b) which is the subject of a separate motion or notice to reject filed by the Debtors and pending as of the Confirmation Hearing.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Executory Contracts and Unexpired Leases identified on the Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List in their discretion prior to the Effective Date on no less than seven days' notice to the non-debtor Entity party thereto.

B.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days prior to the Voting Deadline, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors prior to the Confirmation Hearing (or such other date as may be provided in the applicable assumption notice). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

C.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be treated as General Unsecured Claims.

D.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

E.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.    *Assumption of Directors and Officers Insurance Policies*

The Debtors do not believe that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts.  To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

G.    *Indemnification and Reimbursement Obligations*

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth herein, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the directors, officers, managers, employees, attorneys, other professionals and agents

employed by the Debtors in such capacity on or after the Petition Date to the extent set forth herein. Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those arising from or related in any way to: (1) any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment); (2) any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor; (3) any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors; (4) any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and (5) any action taken or not taken in connection with the Chapter 11 Cases or the Plan. In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof. Notwithstanding anything contained in this Plan, the Reorganized Debtors may in their sole discretion (but have no obligation to) honor each Indemnification Obligation to a director, officer or employee that was no longer employed by the Debtors in such capacity on or after the Petition Date provided that, for each such director, officer or employee, the Debtors shall be permitted to honor Indemnification Obligations only to the extent of available coverage under the applicable D&O Liability Insurance Policy.

H.    *Employee Compensation and Benefits*

1.    Compensation and Benefit Programs

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)    all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Equity Interests in Sbarro, Inc.;

(b)    Compensation and Benefits Programs listed in the Plan Supplement as executory contracts to be rejected;

(c)    Compensation and Benefits Programs that have previously been rejected; and

(d)    Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption contemplated by the Plan in which case any such Compensation and Benefits Program shall be deemed rejected as of immediately prior to the Petition Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

2. <u>Workers' Compensation Programs</u>

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; <u>provided</u> that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; <u>provided</u> <u>further</u> that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

3. <u>Management Compensation Plan</u>

Subject only to the occurrence of the Effective Date, the Management Compensation Plan shall become effective without any further action by the Reorganized Debtors.

4. <u>Management Equity Plan</u>

As soon as reasonably practicable after the Effective Date, the New Board will adopt and implement the Management Equity Plan, pursuant to which retentive and performance-based equity awards (in the form to be determined by the New Board) of no less than 1/2 of the Reserved Employee Equity shall be allocated to certain key employees of the Reorganized Debtors and members of the New Board, a portion of which may be reserved by the New Board for allocation to the Reorganized Debtors' chief executive officer if the selection process for such chief executive officer has not then been completed.[5]

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A. *Distribution on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Initial Distribution Date; <u>provided</u>, <u>however</u>, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) in accordance with Article II.C herein, Allowed Priority Tax Claims, unless otherwise agreed, shall receive (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (b) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court; or (c) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

B. *Distributions on Account of Claims and Interests Allowed After the Effective Date*

1. <u>Payments and Distributions on Disputed Claims</u>

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the

---

[5]   The parameters of the Management Equity Plan and Reserved Employee Equity are the subject of ongoing discussions among the Debtors and the Prepetition First Lien Steering Committee and are subject to change.

Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article IX.A of the Plan, on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

### 2. Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

### C. *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise herein, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably practicable after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. Distributions on account of General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date, or as soon as practicable thereafter.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VII herein. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### D. *Delivery of Distributions*

### 1. Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded security is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 2. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and ***provided further,*** that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

### 3. Delivery of Distributions to Prepetition First Lien Lender Claims

The Prepetition First Lien Agent shall be deemed to be the holder of all Prepetition First Lien Lender Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such

Prepetition First Lien Lender Claims shall be made to or on behalf of the Prepetition First Lien Agent. The Prepetition First Lien Agent shall hold or direct such distributions for the benefit of the holders of Allowed Prepetition First Lien Lender Claims, as applicable. As soon as practicable following compliance with the requirements set forth in Article VII of the Plan, the Prepetition First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of such holders of Allowed Prepetition First Lien Lender Claims. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition First Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Agent.

4.     Distributions by Distribution Agents (if any)

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

5.     Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Stock under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock (up or down), with half dollars and half shares of New Common Stock or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made from on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VI.D.6 below.

6. **Undeliverable Distributions**

(a) Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VI.D.6(b) hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b) Failure to Claim Undeliverable Distributions

No later than 120 days after the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.

In such cases any Cash or New Common Stock held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c) Failure to Present Checks

Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for distribution on account of such Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date, free of any Claims of such Holder with respect thereto, subject to the provisions in Article VI.D.5 hereof. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

E. *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding

distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

F.      *Setoffs*

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, Equity Interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

G.      *Surrender of Canceled Instruments or Securities*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

H.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

If the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. Claims Payable by Insurance

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

A. *Allowance of Claims and Interests*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

B. *Prosecution of Objections to Claims*

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the sole authority: (1) to file, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C. *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D. *Adjustment to Claims and Interests Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Disallowance of Claims or Interests*

Except for any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER**.

F. *Offer of Judgment*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

G. *Amendments to Claims*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1. The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Prepetition First Lien Steering Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance reasonably acceptable to the Debtors and the Prepetition First Lien Steering Committee.

3.      The Confirmation Order shall have been entered and become a Final Order in form and in substance reasonably satisfactory to the Debtors and the Prepetition First Lien Steering Committee.

4.      All documents and agreements necessary to implement the Plan, including, without limitation, the Exit Credit Documents shall have (a) been tendered for delivery and (b) been effected or executed.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5.      The Management Compensation Plan shall be in form and in substance reasonably satisfactory to the Debtors and the Prepetition First Lien Steering Committee.

6.      The Reorganized Debtors shall have a minimum of $10 million of unrestricted Cash after giving effect to cash distributions made pursuant to the Plan and funds received from the initial draw of the New Money Exit Facility.

7.      All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

8.      The Professional Fee Escrow Account shall have been established and funded.

B.      *Waiver of Conditions*

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Prepetition First Lien Steering Committee, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, or the Prepetition First Lien Steering Committee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall:  (1) constitute a waiver or release of any Cause of Action or Claim; (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

## ARTICLE IX.

## RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all

debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

B.     ***Releases by the Debtors***

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE EXIT CREDIT DOCUMENTS OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT.

THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY THE PLAN.

C.     ***Releases by Holders of Claims and Equity Interests***

AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW,

EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE EXIT CREDIT DOCUMENTS OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR A CRIMINAL ACT.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE THE PERSONAL LIABILITY OF ANY OF THE AFOREMENTIONED RELEASED PARTIES IN THIS ARTICLE IX FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTIES FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS.

D.    *Exculpation*

UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS WILL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE , INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; <u>PROVIDED</u> THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; <u>PROVIDED FURTHER</u> THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.

E.    *Injunction*

**THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE X OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY PERSON BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR  PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.**

F.    *Setoffs*

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

G.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.    Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.    Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.    Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.    Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Term Loan Facility, which such disputes shall be adjudicated in accordance with the terms of the Exit Term Loan Facility);

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.     *Modification of Plan*

Subject to the limitations contained in the Plan:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.     *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation of Plan*

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

F.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| Sbarro, Inc.<br>401 Broadhollow Road<br>Melville, New York 11747<br>Attn.:  Stuart Steinberg | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.:  Edward O. Sassower and Nicole L. Greenblatt<br><br>and<br><br>Curtis, Mallet-Prevost, Colt & Mosle LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn:  Steven J. Reisman |
| **Counsel to the Agent for the First Lien Prepetition and DIP Lenders** | **Counsel to the Second Lien Prepetition Lenders** |
| Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attn:  Timothy Graulich and Steven Krause | Quinn Emanuel Urquhart & Sullivan, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York<br>Attn.:  Susheel Kirpalani and Daniel Holzman |

| Counsel to the Creditors' Committee | Indenture Trustee for the Senior Notes |
|---|---|
| Otterbourg, Steindler, Houston & Rosen, P.C.<br>230 Park Avenue<br>New York, New York 10169<br>Attn.: Scott L. Hazan and David M. Posner | The Bank of New York<br>Attn.: Corporate Trust Division, Corporate Finance Unit<br>101 Barclay Street, SW<br>New York, NY 10286 |
| **Counsel to the Ad Hoc**<br>**Group of Certain Holders of the Senior Notes** | **United States Trustee** |
| Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004-2498<br>Attn.: Andrew G. Dietderich | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.: Elisabetta Gasparini and Paul K. Schwartzburg |

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

J.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date or the Solicitation Date, as applicable.  After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://dm.epiq11.com/sbarro or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

L.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control

N.      *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that after the Effective Date and the conclusion of any appeals or other challenges or matters with respect to entry of the Confirmation Order, the Creditors' Committee's functions shall be restricted to, and the Creditors' Committee shall not be heard on any issue except, obtaining a Final Order of the Bankruptcy Court authorizing or approving Accrued Professional Compensation of its Retained Professionals, or the representation of the Creditors' Committee in connection with the review of and the right to be heard in connection with all Professional Fee Claims.  Following the Confirmation Date, in accordance with the foregoing, the attorneys and financial advisors to the Creditors' Committee shall be entitled to assert any reasonable claims for compensation for services rendered or reimbursement for expenses incurred after the Confirmation Date in connection with services to the Creditors' Committee.

O.      *Section 1125(e) Good Faith Compliance*

The Debtors, Reorganized Debtors, the Prepetition First Lien Agent, the DIP Agent, the Creditors' Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

P.     *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

Q.     *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

Respectfully submitted, as of the date first set forth above,

**SBARRO, INC. (on behalf of itself and all other Debtors)**

By:   _/s/_ _____
Name:   [_____]
Title:   [_____]

**EXHIBIT 1**

Existing Letters of Credit

## EXHIBIT 1

Existing Letters of Credit

| **Lender** | **Face Amount of Letters of Credit Outstanding** | **Beneficiary** | **Expiration Date** |
|---|---|---|---|
| BANK OF AMERICA, N.A. | $665,054.30 | Sol Goldman Investments LLC 640 Fifth Avenue, Third Floor New York, NY 10019 | February 29, 2012 |
| BANK OF AMERICA, N.A. | $400,000.00 | Madison/Fifth Associates, LLC 277 Park Avenue, Suite 4700 New York, NY 10172 | December 31, 2011 |
| BANK OF AMERICA, N.A. | $45,833.33 | Marketplace Redwood Ltd Partnership One Wells Avenue Newton, MA 02459 | December 31, 2011 |
| BANK OF AMERICA, N.A. | $1,000,000.00 | 1604-1610 Broadway Owner, LLC c/o SL Green Management Corp. 420 Lexington New York, NY 10170 | December 31, 2011 |
| BANK OF AMERICA, N.A. | $45,833.33 | Marketplace Redwood Ltd Partnership One Wells Avenue Newton, MA 02459 | December 31, 2011 |
| BANK OF AMERICA, N.A. | $108,682.83 | Hauppauge, LLC c/o Lerner-Heidenberg Properties 234 Closter Dock Road Closter, NJ 07624 | December 31, 2011 |
| BANK OF AMERICA, N.A. | $35,040.30 | City of San Antonio Aviation Department 9800 Airport Boulevard San Antonio, TX 78216 | November 1, 2011 |
| BANK OF AMERICA, N.A. | $867,000.00 | Performance Food Group, Inc. 12500 West Creek Parkway Richmond, VA 23238 | November 8, 2011 |
| BANK OF AMERICA, N.A. | $90,667.44 | Deer Park, LLC c/o Lerner-Heidenberg Properties 234 Closter Dock Road Closter, NJ 07624 | November 30, 2011 |
| **TOTAL** | $3,258,111.53 | | |

## **EXHIBIT 2**

Exit Term Loan Facility Term Sheet

**EXHIBIT 2**

**Exit Term Loan Facility
Summary of Principal Terms and Conditions[1]**

| | |
|---|---|
| **Borrower** | Reorganized Sbarro, Inc. ("**Borrower**") |
| **Guarantors** | Reorganized Holdings and each of Borrower's direct and indirect domestic subsidiaries |
| **Conditions to Closing** | Usual and customary for facilities of this nature, and to include without limitation:<br>(i)  the satisfaction of the majority of the Exit Term Loan Lenders, in their sole discretion, with:<br>    a. the Plan,<br>    b. the terms, entry and effectiveness of a final, non-appealable confirmation order with respect to the Plan and<br>    c. the effectiveness of the Plan and the reorganization of the Company and its affiliated debtors pursuant to the terms of the Plan;<br>(ii)  cash at closing to be at least $10 million and<br>(iii) other conditions as deemed necessary by the Exit Term Loan Lenders. |
| **Facility Amount & Type** | A senior secured first lien term loan facility (the "**Exit Term Loan Facility**;" the loans thereunder, "**Exit Term Loans**;" the documentation with respect thereto, the "**Exit Term Loan Facility Documentation**;" and the lenders with respect thereto, the "**Exit Term Loan Lenders**") in an aggregate principal amount, to be determined in the Steering Committee's sole discretion, not to exceed $110 million |
| **Maturity** | Fifth anniversary of the effective date of the Plan |
| **Collateral** | A perfected first priority lien on all assets of the Borrower and the Guarantors, subject to customary exclusions |
| **Interest Rate** | LIBOR + 9.50% |
| **Additional Pricing Terms** | LIBOR Floor of 1.50%<br>During the continuation of an Event of Default, such rate shall be increased by 2% |
| **Upfront Fees** | 1% on the DIP Facility Claims converted into notes under the Exit Term Loan Facility; none on the converted Prepetition First Lien Lender Claims |
| **Scheduled Amortization** | None |
| **Call Protection** | Not callable in year 1. Callable at 103%, 102% and 101% in year 2, 3 and 4, respectively |

---

[1] Capitalized terms used but not defined herein have the meanings set forth in the Plan to which this Exhibit 2 is attached.

| | |
|---|---|
| **Mandatory Prepayments** | The Exit Term Loans shall be prepaid with:<br>  (i)  75% of Excess Cash Flow (to be defined in the Exit Term Loan Facility Documentation),<br>  (ii)  100% of the net cash proceeds of asset sales (including involuntary dispositions and subject to de minimis exclusions to be substantially the same as those set forth in the Prepetition First Lien Credit Facility),<br>  (iii) 50% of the proceeds of equity issuances and<br>  (iv) 100% of the proceeds of debt incurrences (other than debt permitted under the Exit Term Loan Facility Documentation) |
| **Representations and Warranties** | Usual and customary for facilities of this type |
| **Affirmative and Negative Covenants** | The Reorganized Debtors shall be permitted to incur priority debt in an amount not to exceed $26.5 million, inclusive of, and on the same terms as, the New Money Exit Facility<br><br>Other usual and customary for facilities of this type |
| **Financial Covenants** | 1. Maximum leverage ratio<br>2. Minimum interest coverage ratio<br>3. Maximum capital expenditures |
| **Events of Default** | Usual and customary for facilities of this type |
| **Financial and Other Reporting** | Usual and customary for facilities of this type |
| **Amendments and Voting** | Usual and customary for facilities of this type |
| **Expenses and Indemnification** | Usual and customary for facilities of this type |
| **Other Provisions** | The Exit Term Loan Facility Documentation will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions |
| **Assignments and Participations** | Substantially the same as those set forth in the Prepetition First Lien Credit Facility |
| **Governing Law** | State of New York |
| **Exit Facility Agent** | Cantor Fitzgerald Securities |

**<u>EXHIBIT 3</u>**

New Money Exit Facility Term Sheet

[TO COME]

**Exhibit B**

**Solicitation Procedures Order**

**[TO COME]**

**Exhibit C**

**Financial Projections**

**[TO COME]**

**Exhibit D**

**Liquidation Analysis**

**[TO COME]**

### Sbarro, Inc. Corporate and Capital Structure

